THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAUL QUIROZ, Defendant-Appellant.

Second District    No. 2—92—1208

Opinion filed December 9, 1993.—Rehearing denied January 20, 1994.

Rodolfo Garcia and David D. Reyes, both of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

A jury found defendant, Raul Quiroz, guilty of two counts of solicitation of murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1 (now 720 ILCS 5/8—1.1 (West 1992))) of his father, Roberto Quiroz. The trial court sentenced defendant to concurrent sentences of 18 years and 15 years in the Illinois Department of Corrections. Defendant appeals, alleging that the State failed to prove him guilty beyond a reasonable doubt and that the trial court erroneously instructed the jury on accountability and specificity of the dates in the indictment. We affirm.

Roberto Quiroz was shot and killed near his van outside of his apartment in Villa Park during the early morning hours of May 23, 1991. Roberto had separated from his wife, defendant's mother, and was living with his girlfriend, Gloria Contreras, at the time of his murder. He owned a maintenance business called R.A.Q. Contract Cleaning.

Defendant was arrested for Roberto's murder on June 9, 1991, and subsequently indicted on one count of murder without lawful justification and with the intent to kill (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1) (now codified, as amended, at 720 ILCS 5/9—1(a)(1) (West 1992))), one count of murder by shooting Roberto knowing such act created a strong probability of death or great bodily harm (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2) (now codified, as amended, at 720 ILCS 5/9—1(a)(2) (West 1992))), and one count each of the solicitations of Michael Adams and Darren Brown to commit murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1 (now 720 ILCS 5/8—1.1 (West 1992))). Defendant's first trial in March 1992 ended in a mistrial after the jury was unable to reach a unanimous verdict on any of the counts. Defendant was retried in June 1992.

The evidence at the second trial established that defendant had worked for Roberto's cleaning business during late 1990. Roberto traveled to Mexico sometime during January 1991 and told defendant to run the business in his absence. Roberto returned from Mexico in February 1991 with Gloria Contreras, whom he had married in Mexico even though he was not divorced from his wife, defendant's mother. Roberto was apparently unhappy with defendant's performance with the business and took the company back under his control. The evidence indicates that defendant had stolen checks from the company checkbook and forged them to pay for his personal bills and to buy compact discs. Defendant was upset with his father for taking back the business and began expressing his sentiments to his friends.

Carol Mladucky testified that she lived in an apartment with Darren Brown and Michael Adams from April 1, 1991, until sometime in June 1991. Defendant came over to their apartment several times. She frequently heard defendant talk about his father taking control of the business from him and that he was very upset about it. She said defendant was also upset about his father's girlfriend. Mladucky recalled two occasions when she was in the apartment with Brown, Adams, and defendant. Defendant was discussing the problems with his father. Defendant then asked them if they knew of anyone who would "knock somebody off." Mladucky said that defendant's questions were basically ignored, but that defendant had a blank look on his face and was not laughing when he asked the question. Mladucky also heard Brown and defendant talking about breaking into a van and taking checks to buy compact discs.

Darren Brown testified that he was a close friend of defendant's before the murder and had worked for R.A.Q. Contract Cleaning. He saw defendant quite often during the first few months of 1991. Brown saw defendant remove checks from the company checkbook while his father was in Mexico. He knew defendant wrote checks out for his rent payments. Brown testified that defendant first talked about killing his father about two weeks after his father returned from Mexico late in January or early in February 1991. Defendant was upset and said he wanted to kill his father for taking back the business. During March 1991, Brown talked with a friend named Michael Adams and asked him if he knew of someone or if he himself would hire out to kill someone. Adams said he would do it for the right price but was not accepting anything at the time. Brown testified that neither defendant's nor defendant's father's name specifically was mentioned.

Brown testified that defendant brought up the subject again a week or two later while they were talking alone. Defendant discussed the various ways he could kill his father, either by shooting him, using a knife, or cutting the brake lines on his van. Brown told defendant that Michael Adams might do it and defendant asked him "to look into it."

Brown testified that sometime in April 1991 he was talking in his apartment with Adams, Mladucky, and defendant. Defendant asked Adams to kill his father. Adams declined, but said he knew of someone who would do it although this person was out of State and Adams would have to contact him. Brown testified that he was in the apartment with defendant, Carol, and Adams on another occasion when Adams and defendant were engaged in a conversation that Brown could not hear.

Adams' testimony corroborated most of Brown's statements except that Adams said the first conversation in the apartment occurred approximately one week before Roberto's murder. Adams testified that defendant was talking that day about problems going on with his father and his family. Defendant appeared very nervous and edgy. He asked Adams if he knew anybody that did professional hits and what that would consist of. Adams replied that he used to know such people but did not associate with them anymore. Defendant then asked Adams "[w]ell, would you do it? I mean, could I pay you? Would it be easier? Would it be cheaper?" Adams declined. Adams stated that defendant asked these questions in the specific context of killing his father.

Adams stated that the second conversation with defendant occurred about three days before the murder. Adams was at his apartment with Brown, Mladucky, and defendant. Adams testified that, as defendant was leaving the apartment, he walked by Adams and asked: "[h]ave you given anything any more thought *** given any more ideas about making some extra cash?" Adams again declined, and defendant replied that he would take things into his own hands and "be on his merry way." Adams admitted he did not tell the police about this conversation in his initial interview with them after the murder.

Gloria Contreras testified that she overheard a conversation between defendant and his father, Roberto, about two weeks before the murder. She heard Roberto say he would call the police if defendant did not pay the money he owed him because it was not the first time defendant had stolen money.

On the evening before the murder, defendant and Brown ate pizza with some of defendant's family and then went to a friend's house to watch a basketball game. Defendant and Brown left about 10:30 p.m. so that defendant could drive Brown home. In the car, defendant brought up the subject of killing his father. Defendant asked Brown to be his alibi. Brown agreed. Defendant then asked Brown to drive him to the apartment and then "take him away after the deed was done." Brown declined. Defendant said that was okay, he would get another friend, Don Foytik, to do it. Brown then went home and went to bed. Roberto was murdered the following morning around 6:15 a.m.

Defendant called Brown late the next night after the murder. Defendant said his father was dead and that the police would be coming by to question Brown as a formality because they were talking to everybody who worked for the company. Defendant then said "[y]ou know nothing, right?" Brown spoke to defendant a week and a half

later and asked him if he killed his father. Defendant said he had shot him. A few days later, defendant talked further to Brown about his father's death. Defendant said he rode his bike over to his father's apartment, knocked on the door and asked his father to come out, and shot him. Brown testified that he was later asked by the police to wear a recording device and visit defendant at his workplace for the purpose of obtaining incriminating conversation. The tape and transcript of that conversation were admitted into evidence.

Robert Deevey, Villa Park police officer, interviewed defendant after Roberto's murder. Defendant said he owed his father $1,000, then later admitted he owed $4,000.

Defense counsel moved for a directed verdict after the State rested. The trial court denied the motion and commented that, for solicitation, a request to aid and abet is asking to commit and that solicitation of a third party is enough. The court also determined that a specific date for the solicitation was not necessary. The jury returned guilty verdicts on both solicitation counts. Defendant filed a timely appeal.

Defendant first argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of solicitation of murder involving Brown. A person commits the offense of solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages, or requests another to commit that offense. (Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1(a) (now 720 ILCS 5/8—1.1(a) (West 1992)).) The indictment charged defendant with solicitation in that he *requested* Brown to commit the offense of murder. Solicitation of murder is a Class X felony with a possible sentence of not less than 15 years and not more than 30 years. Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1(b) (now 720 ILCS 5/8—1.1(b) (West 1992)).

The intent to commit the crime of solicitation is a state of mind which may be inferred from surrounding circumstances because every sane person is presumed to intend the natural and probable consequences of his or her actions. (*People v. Pagliuca* (1983), 119 Ill. App. 3d 906, 910.) The standard to be applied by a reviewing court considering a challenge to the sufficiency of the evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49.) It is the jury's function to draw conclusions based on the evidence and to decide whether there is a reasonable doubt as to defendant's guilt. (*Young*, 128 Ill. 2d at 51.) In applying this standard, we cannot say that the jury could not properly deter-

mine that the essential elements of solicitation of murder had been proven beyond a reasonable doubt.

■ The State was required to prove that defendant intended for his father to be murdered and that he requested Brown to commit the murder. Defendant contends the record is devoid of any evidence of such request. The testimony revealed that defendant and Brown were close friends prior to Roberto's murder. Brown often heard defendant complain about his father taking back the business and in later conversations heard him express that he wanted to kill his father. Brown decided to talk to Adams about whether he was available to "knock someone off." Brown told defendant he might be able to find someone to kill his father and defendant told Brown "to look into it." On the night before Roberto's murder, defendant asked Brown to be his alibi. Brown said that he would do so. Defendant then asked Brown to drive him to his father's apartment and take him away when the deed was done, which Brown declined to do.

We believe defendant's comments to Brown support a finding of solicitation. It is irrelevant that Brown was not directly requested to perform the murder. Evidence that he was requested to "look into" getting Adams to do so was sufficient. (See *Pagliuca*, 119 Ill. App. 3d at 906.) In *Pagliuca*, defendant Perez was incarcerated with a man named Middleton. Perez asked Middleton to arrange to kill a witness in a case pending against Perez. Middleton informed the police who then arranged for an undercover agent, Houtsma, to pose as the hit man. Perez and another defendant, Pagliuca, arranged to get a gun to Houtsma and instructed him on the intended victim. The court in *Pagliuca* stated that the entire sequence of events between the codefendants, Middleton, and Houtsma must be viewed as a single transaction, one solicitation. Such solicitation to murder the intended victim was a continuous act of encouraging and requesting Houtsma and Middleton to commit the offense. (*Pagliuca*, 119 Ill. App. 3d at 911.) The court concluded that Perez solicited Houtsma through Middleton to commit the murder; therefore, the evidence showed beyond a reasonable doubt that Perez solicited Houtsma and/or Middleton. *Pagliuca*, 119 Ill. App. 3d at 910.

Similarly, we believe defendant solicited Brown here by asking him to look into getting Adams to commit the actual murder. Brown evidently would not have asked Adams about "knocking someone off" if defendant had not expressed his desire to kill his father. Defendant also unsuccessfully attempted to involve Brown with the act of murder by asking Brown to drive him to his father's apartment and take him away after the deed was completed. We conclude that a jury

could find defendant's conversations with Brown were sufficient to constitute a request of solicitation of murder.

■ We also reject defendant's argument that the evidence was insufficient to establish his guilt by accountability regarding any solicitation allegedly committed by Brown. The State theorized at trial that defendant could be accountable for any solicitation of murder by Brown of Michael Adams. The jury was given an accountability instruction that defendant contends was erroneous as discussed later in this opinion. Defendant claims there was no evidence that Brown requested Adams to commit the murder of Roberto specifically, no evidence this was at the request of defendant, and no evidence of concurrent specific intent between the defendant and Brown. Given the testimony discussed above, we believe Brown's actions in asking Adams about "knocking someone off" were in furtherance of the defendant's desire that his father be killed. Brown's questions to Adams were clearly intended to seek information for the defendant and indicated Brown and defendant's concurrent intent. Their ongoing negotiation continued when Brown informed defendant that Adams might commit the murder and defendant asked Brown to look into it further. We believe the jury's verdict was not erroneous.

Defendant next argues that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt of solicitation of murder involving Adams. The indictment on this count also charged that defendant *requested* Adams to commit the offense of murder.

■ Defendant concedes there is some evidence to support a finding that a "request" was made, but that such evidence was insufficient. Defendant also argues that Adams was asked "[c]an you do it?" which is a mere inquiry, as opposed to "[w]ill you do it?" which denotes a request. However, the record clearly indicates that defendant asked Adams "well, would you do it? I mean, could I pay you?" Defendant also asked about the going rate for such acts. Defendant's questions are more indicative of a request than a mere inquiry, especially given the context of the conversation and the fact that defendant was complaining about his father. Defendant pursued Adams a second time when he asked if Adams had given it any more thought. Brown and Mladucky gave corroborating testimony that conversations between defendant and Adams took place. We do not believe that the inconsistencies in time and circumstance between these witnesses render this evidence unsatisfactory as to leave a reasonable doubt of defendant's guilt.

■ Defendant also argues that Adams' failure to tell the police about these conversations at his first meeting with the police shatters

his credibility. Villa Park police detective Thomas Wenshutonis stated that the first interview with Adams was of short duration because Adams said he had just begun a new job and did not want to be late for work. The police planned to make contact with Adams and call him back later for additional questioning. Adams testified that defendant called him four days after the murder to say that Adams, Brown, and defendant were possible suspects in his father's murder. Therefore, the jury could find that Adams was reticent to divulge his conversations with defendant to the police. Adams did give the police a more detailed statement as to these conversations the next day during police questioning. We conclude the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of the solicitation of Adams.

Defendant next contends his right to a fair trial was violated since the jury was instructed that the State was not required to prove that the offense was committed on the particular date charged. (See Illinois Pattern Jury Instructions, Criminal, No. 3.01 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 3.01).) The indictment charged in count III that defendant solicited Adams sometime between May 1, 1991, and May 22, 1991. Count IV charged that defendant solicited Brown on or about May 22, 1991. Defendant requested a bill of particulars after the first trial seeking the specific date that the alleged offenses occurred. The trial court denied the motion, stating that the defense was adequately informed to prepare its defense.

■ The Committee Note regarding IPI Criminal 3d No. 3.01 states that this instruction should be given only when there is a variance between the date alleged and the evidence, and all dates are within the period of limitations. The Note further states that the instruction should not be given if the State has filed a bill of particulars stating the date of the crime. (See IPI Criminal 3d No. 3.01, Committee Note, at 77.) Since no bill of particulars was filed here, the instruction was not improper on this basis.

We disagree with the State's contention that defendant failed to object to the instruction involving Brown. Since the record shows the contrary, we address this issue as to both Brown and Adams. The decision whether to grant a bill of particulars is within the discretion of the trial court and is not a matter of right. (*People v. Harris* (1989), 187 Ill. App. 3d 832, 843.) The date alleged in the indictment is generally not material, and the indictment is sufficient if the State proves the offense occurred at any time within the statute of limitations period. (*People v. Cregar* (1988), 172 Ill. App. 3d 807, 823.) Accordingly, Illinois courts have held that it is proper to instruct the jury that the

prosecution need not prove that the offense occurred on the date charged in the indictment. (See *People v. Barlow* (1989), 188 Ill. App. 3d 393.) However, it has been stated that giving IPI Criminal 2d No. 3.01 may result in reversible error where the inconsistencies between the date charged in the indictment and the evidence presented at trial are so great that the defendant is misled in presenting his defense or his alibi for the time as alleged in the indictment and is thereby prejudiced because he failed to gather evidence and witnesses for the time actually proved by the State. (*People v. Wheeler* (1991), 216 Ill. App. 3d 609, 620.) Courts have found such an instruction to be proper where the date alleged in the indictment was not a material element of the offense, the date was sufficient to show that the offense charged was committed within the statute of limitations period and the date preceded the return of the indictment. *People v. Barlow* (1989), 188 Ill. App. 3d 393, 403.

Defendant alleges this instruction sent an underlying message telling the jury to ignore the discrepancies in the testimony of Brown and Adams. Adams testified he was first approached by Brown in regards to killing the victim 10 or 11 days before the murder, which occurred on May 23, 1991. Brown testified that he first spoke to Adams on the subject in March 1991. Adams also testified that defendant first spoke to him about killing his father about one week before the murder. Brown testified that defendant asked Adams if he would kill his father sometime in mid-April 1991. The testimony was uncontradicted that these conversations took place and that the subject was the defendant's wish to kill his father, but none of the witnesses could pinpoint an exact date for any of these occasions. However, we conclude that proof of the precise dates of the alleged offenses is unnecessary where, as here, the allegation of the particular dates is not an essential ingredient of the offense and the statute of limitations is not in question. Therefore, the jury instruction as to Adams was proper.

We also conclude the instruction as to Brown was not erroneous. The evidence indicates that on May 22, 1991, defendant asked Brown to drive him to his father's apartment and then drive him away when the deed was done. This date matches the indictment. The other evidence of solicitation as to Brown occurred when defendant asked him to look into getting Adams to murder defendant's father. This occurred sometime in March 1991, which was not covered by the date in the indictment. Nonetheless, we do not hold that this was reversible error since the date was not a material element of the offense and defendant was not prejudiced in his preparation of the case.

Defendant finally contends that the jury instruction on accountability was reversible error where no evidence was presented to support such instruction. The jury was instructed as follows:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense." See IPI Criminal 2d No. 5.03 (1989 Supp.).

The State's theory was that defendant solicited Brown and Adams to kill Roberto. Therefore defendant argues that the instruction should not have been given since the evidence here established defendant as a principal and not as an accessory.

A defendant may be held accountable for the conduct of another where the evidence shows that he solicited, aided, abetted, agreed, or attempted to aid another in the planning or commission of an offense, that his participation took place before or during the commission of the offense, and that he had a concurrent, specific intent to facilitate or promote the commission of the offense. (*People v. Baney* (1992), 229 Ill. App. 3d 770, 773-74.) While it is improper to instruct the jury on accountability where the evidence only shows that a defendant acted as a principal, the State is entitled to such an accountability instruction where there is evidence showing defendant's participation both as a principal and an assistant in commission of the offense. (*People v. Pryor* (1988), 170 Ill. App. 3d 262, 269.) Only slight evidence is necessary to justify giving an instruction on accountability. *People v. Fusco* (1993), 245 Ill. App. 3d 524, 529.

The record indicates that Brown reported to defendant that Adams might be willing to commit the murder of defendant's father. Defendant then asked Brown to look into it further. We believe the accountability instruction as to the solicitation charges was not error given Brown's solicitation of Adams on behalf of defendant.

For the foregoing reasons, we affirm the decision of the circuit court of Du Page County.

Affirmed.

GEIGER and BOWMAN, JJ., concur.