THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM R. TERRELL, Defendant-Appellant.

Fifth District   No. 5—02—0367

Opinion filed June 11, 2003.

Daniel M. Kirwan and Paige Clark Strawn, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

James Roberts, State's Attorney, of Hillsboro (Norbert J. Goetten, Stephen E. Norris, and T. David Purcell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:
After a February 2002 bench trial, the defendant, William R. Ter-

rell, was convicted of one count of solicitation of murder (720 ILCS 5/8—1.1(a) (West 2000)). The defendant appeals, arguing that his request that his girlfriend's stepfather, Larry Wilkins, drive him and his intended victim to the place where he planned to murder her did not fit within the statutory definition of solicitation of murder. We reverse.

## I. BACKGROUND

Wilkins became acquainted with the defendant while the defendant was dating Wilkins' stepdaughter, Jewel Cooper. In August and September 2001, when the events leading to the charges against the defendant took place, Wilkins, his wife, and three of his children from a prior marriage were temporarily residing with Cooper in her home. Both Wilkins and the defendant met the intended victim, Leslie Harp, when Wilkins' son, Edward Kampmon, brought her to Cooper's home after befriending her at a Hardee's restaurant. Kampmon is mentally disabled, and it appeared to Wilkins that Harp was also mentally disabled. Cooper and the defendant had argued that day. The defendant began talking to Harp and later asked Wilkins to drive him and Harp to rural property Wilkins owned in Sawyerville, Illinois, where the two spent the night in an abandoned car. Wilkins returned to the property the following morning to drive Harp and the defendant home. After they dropped Harp off at her home, the defendant confided to Wilkins that he had a sexual relationship with Harp and asked Wilkins not to tell Cooper about it.

Approximately three to four weeks later, Harp returned to Cooper's home and informed Wilkins and his wife, Linda, that she was pregnant by the defendant. Linda Wilkins told Cooper that Harp claimed to be pregnant with the defendant's child, and Cooper confronted the defendant about it. He denied having been involved with Harp. Sometime thereafter, however, the defendant confided to Wilkins that he planned to kill Harp in order to prevent Cooper from discovering his relationship with her.

Initially, the defendant told Wilkins that he intended to ask his sister to kick Harp in the stomach to kill the baby and then he intended to get her drunk and give her capsule pills filled with boric acid. He intended to kill her at Wilkins' Sawyerville property and dump her body in a well. Because the defendant had no car or driver's license, he asked Wilkins to drive him and Harp to the property. Wilkins told the defendant that he would help him, but instead he informed the police of his conversation with the defendant.

The defendant later informed Wilkins that he had found a different location in which to kill Harp, a location that he thought would be

more appropriate. Although he did not tell Wilkins where the location was, he again asked him to assist by picking up Harp in his car. Wilkins again contacted the police and reported what had transpired. He agreed to record any further discussions with the defendant.

On September 26, 2001, Wilkins visited the defendant at his home, where the defendant showed him a hatchet, some rope, and a steel bar. He told Wilkins that he intended to hit Harp in the head with the steel bar and use the hatchet to either cut her throat or chop her up. At the defendant's request, Wilkins drove him to buy a shovel and then drove him to an abandoned house outside of Litchfield, Illinois, where the defendant intended to kill Harp. Inside the house, the defendant used the shovel to dig a grave for Harp in the dirt floor. The shovel broke and Wilkins drove the defendant to Wal-Mart to buy another shovel and then drove him back to the house, where he dug a second hole in which he planned to bury Harp. The defendant asked Wilkins to drive him and Harp to the site two days later. He did not ask Wilkins to be present during the murder or assist in any way beyond driving him and Harp to the abandoned house.

The following day, the State charged the defendant by information with one count of attempt (first-degree murder) (720 ILCS 5/8—4(a), 9—1(a)(1) (West 2000)) and one count of solicitation of murder (720 ILCS 5/8—1.1(a) (West 2000)). On February 22, 2002, the defendant was tried in a bench trial. The court took the matter under advisement and, on March 1, 2002, found the defendant not guilty of attempt (first-degree murder) but found him guilty of solicitation of murder. On April 19, 2002, the trial court sentenced the defendant to 18 years in the Department of Corrections. On May 17, 2002, the court denied the defendant's motion to reduce his sentence. This appeal followed.

## II. ANALYSIS

The defendant argues that the State failed to prove him guilty of solicitation of murder beyond a reasonable doubt because he did not request, encourage, or command Wilkins to commit the murder; rather, he argues that he intended to kill Harp himself and that he asked Wilkins only to drive him and Harp to the site where he planned to kill her. We agree.

In order to sustain a conviction for solicitation of murder, the State must prove that the defendant (1) intended that the offense of first-degree murder be committed and (2) commanded, encouraged, or requested another person to commit the murder. 720 ILCS 5/8—1.1(a) (West 2000). We review challenges to the sufficiency of the evidence in the light most favorable to the prosecution to determine whether any

reasonable trier of fact could find the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985). Although couched in terms of the sufficiency of the evidence, the defendant's argument really goes to the definition of the words "to commit" in the solicitation statute. We review questions of statutory construction *de novo. People v. Glisson*, 202 Ill. 2d 499, 504, 782 N.E.2d 251, 254 (2002).

The solicitation statute in Illinois provides, "A person commits solicitation of murder when, with the intent that the offense of first[-] degree murder be committed, he commands, encourages[,] or requests another *to commit that offense.*" (Emphasis added.) 720 ILCS 5/8— 1.1(a) (West 2000). The defendant contends that requesting another person to assist him in committing a murder by driving him and the intended victim to the site where he planned to kill her himself does not fall within this statutory definition. The State, by contrast, contends that because the act that the defendant requested Wilkins to perform would have made Wilkins guilty of murder on an accountability theory had he performed it, the defendant's request was in fact a request "to commit" the murder.

In support of its position, the State cites the Second District Appellate Court's decision in *People v. Quiroz*, 253 Ill. App. 3d 739, 625 N.E.2d 856 (1993). We find *Quiroz* distinguishable. There, the defendant was angry with his father for taking back control of the family cleaning business. He told his close friend, Brown, that he wanted to kill his father. Brown told the defendant that he might be able to find someone to kill his father for him. The defendant asked Brown to " 'look into it.' " *Quiroz*, 253 Ill. App. 3d at 745, 625 N.E.2d at 861. The defendant later asked Brown's friend if he could either kill his father or find someone else to do so. *Quiroz*, 253 Ill. App. 3d at 743, 625 N.E.2d at 859-60. The defendant eventually decided to kill his father himself and asked Brown to provide an alibi for him and drive him to his father's apartment and drive him away from the apartment after he had killed him. Brown agreed to provide an alibi but refused to drive the defendant. *Quiroz*, 253 Ill. App. 3d at 743, 625 N.E.2d at 860. The defendant fatally shot his father and was charged with two counts of solicitation as well as one count of murder. *Quiroz*, 253 Ill. App. 3d at 741, 625 N.E.2d at 858.

The defendant in *Quiroz* argued on appeal that the State failed to prove him guilty of solicitation with respect to his requests to Brown because he had not asked Brown to do the actual killing. *Quiroz*, 253 Ill. App. 3d at 744, 625 N.E.2d at 860. In affirming his conviction, the *Quiroz* court relied on *People v. Pagliuca*, 119 Ill. App. 3d 906, 458 N.E.2d 908 (1983). In *Pagliuca,* one codefendant requested that his

cellmate find someone to kill a witness for him. The appellate court upheld the solicitation conviction, finding that "[t]he entire sequence of events *** must be viewed as a single transaction, one solicitation," and that, therefore, the defendant had solicited the intended "hit man" through his cellmate. *Pagliuca*, 119 Ill. App. 3d at 910, 458 N.E.2d at 912. The *Quiroz* court found this sequence of events analogous to Quiroz's request that Brown "look into" arranging for someone to murder his father. *Quiroz*, 253 Ill. App. 3d at 745, 625 N.E.2d at 861. Courts of other jurisdictions presented with solicitation scenarios have reached the same result. See, *e.g.*, *Moss v. State*, 888 P.2d 509, 517 (Okla. Crim. App. 1994) ("If we were to hold otherwise, all one would have to do is place a third (or more) person in the chain and escape judgment ***"); *State v. Yee*, 160 Wis. 2d 15, 465 N.W.2d 260 (1990).

■ We acknowledge that in *dicta* the *Quiroz* court appeared to find that the defendant's requests that Brown drive him to and from the scene of the crime and provide him with an alibi provided additional support for the solicitation conviction. Before concluding that the defendant's request that Brown look into finding someone to commit the murder was sufficient to sustain a solicitation conviction, the court noted that by making these requests, the defendant "also unsuccessfully attempted to involve Brown with the act of murder." *Quiroz*, 253 Ill. App. 3d at 745, 625 N.E.2d at 861. The court, however, did not need to decide whether these requests, standing alone, would have supported a conviction for solicitation of murder. For the reasons that follow, we find that to be a significant difference and agree with the defendant that *Quiroz* is distinguishable from the instant case.

The only case of which we are aware that addresses a situation analogous to that before us is *People v. Harsit*, 193 Misc. 2d 680, 745 N.Y.S.2d 872 (N.Y. Sup. Ct. 2002). There, the defendant asked a man, who turned out to be a police informant, to help him purchase an automatic or semiautomatic gun, which he intended to use to kill a judge who had dismissed a case he had filed, the tenants in a building the defendant owned, and two attorneys. *Harsit*, 193 Misc. 2d at 683, 745 N.Y.S.2d at 875. The defendant filed a motion to dismiss the solicitation charge, arguing, as the defendant does here, that he had intended to use the gun himself and had never asked anyone to murder the intended victims for him. *Harsit*, 193 Misc. 2d at 688, 745 N.Y.S.2d at 878. The court rejected this argument because the New York solicitation statute under which the defendant was charged, unlike the Illinois solicitation statute, expressly proscribed solicitation of any "conduct constituting a Class A Felony." *Harsit*, 193 Misc. 2d at 688, 745 N.Y.S.2d at 878. Because our own statute contains no such express provision, *Harsit* does not aid in our decision.

The dearth of case law addressing analogous facts demonstrates the rarity of the scenario presented by this case. It is quite likely that the legislature, when drafting the solicitation statute, did not even consider whether conduct such as that here at issue should fall within its purview. However, even assuming that the lack of language expressly prohibiting conduct such as the defendant's is the result of legislative oversight, we may not ignore the plain language of the statute. See *People v. Reeves*, 326 Ill. App. 3d 1083, 1086, 762 N.E.2d 1124, 1126 (2002).

Moreover, we believe there are valid reasons to distinguish between requests to aid and abet in the commission of a crime and requests that another actually commit the crime or procure a third person to do so. In *People v. Kauten*, 324 Ill. App. 3d 588, 591, 755 N.E.2d 1016, 1018 (2001), a defendant argued that the sentencing statute for solicitation of murder violated the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it provides a more severe penalty than that for conspiracy to commit murder or attempt (murder). Although this is not analogous to the issue we face, we find the *Kauten* court's observations about the purposes of the solicitation statute instructive.

One purpose of the solicitation statute is to punish the actions of those who might otherwise be able to "hide behind [their] hireling(s)." *Kauten*, 324 Ill. App. 3d at 592, 755 N.E.2d at 1019. Clearly, such concerns are not raised in a situation where, as here, a defendant merely solicits assistance in carrying out a crime he intends to commit himself.

The *Kauten* court also noted: "A person who is \*\*\* unable to commit murder on his or her own may solicit the help of another (or many others) who would otherwise lack the incentive to commit murder. What neither would attempt individually may come about by their cooperation." *Kauten*, 324 Ill. App. 3d at 592, 755 N.E.2d at 1020. The court further noted that, in proscribing solicitation, a state is "rightly concerned 'not only with the prevention of the harm that would result should the inducements prove successful, but with protecting [its] inhabitants \*\*\* from being exposed to inducements to commit or join in the commission of the crimes specified.' " (Emphasis omitted.) *Kauten*, 324 Ill. App. 3d at 593, 755 N.E.2d at 1020, quoting *People v. Burt*, 45 Cal. 2d 311, 314, 288 P.2d 503, 505 (1955).

Although both of these latter concerns *are* implicated by the type of solicitation the defendant engaged in, we find them sufficiently different from the more typical solicitation scenario to warrant different treatment. The primary distinction is the capacity of the solicitor to abandon his criminal attempt when he intends to be the primary ac-

tor. The situation at bar provides a good illustration. Because the defendant had no transportation, he would not have been able to carry out his plan to murder Harp without Wilkins' assistance. Had Wilkins performed the acts requested of him by the defendant, he would have joined in the commission of the crime, which could not have occurred had the defendant not requested his assistance—but only if the defendant followed through with his plan to murder Harp. By contrast, had Wilkins agreed to a request to murder Harp for the defendant, the murder would have occurred even if the defendant changed his mind. Although we are not certain why the trial court did not find the defendant guilty of attempted murder, it is quite possible that the court found that he lacked the intent to commit the murder in light of the many changes he had made to his plan and the many reasons he had found to delay carrying it out. To punish the defendant for solicitation under the circumstances presented would be to punish him for entertaining murderous thoughts, no matter how hypothetically.

We conclude that the Illinois solicitation-of-murder statute does not encompass solicitation to aid and abet in the commission of a murder. Thus, the conviction must be reversed.

## III. CONCLUSION

For the foregoing reasons, we reverse the defendant's conviction for solicitation of murder.

Reversed.

MAAG and KUEHN, JJ., concur.