2025 IL App (1st) 231408-U

No. 1-23-1408

Order filed May 2, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 1101001 |
| | ) | |
| CALEB RALLINGS, | ) | Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mitchell and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: There was sufficient evidence for the trial court to find that defendant acted voluntarily when he accelerated his vehicle at a high rate of speed and failed to brake.

¶ 2    Defendant, Caleb Rallings, appeals from a conviction of reckless homicide in connection with one death and several injuries, following a motor vehicle collision. For the following reasons,

we find that there was sufficient evidence for the trial court to find that defendant acted voluntarily when he accelerated his vehicle at a high rate of speed and failed to brake.

¶ 3                                          I. BACKGROUND

¶ 4    Rallings was charged with aggravated driving under the influence (DUI) and reckless homicide. A bench trial in this case began on April 24, 2023, where the following evidence was presented. On June 30, 2018, between 5 and 6 a.m., Ricardo Enrique Borja, Juan Carlos Garcia-Mayo, and Arnold Butler, arrived at the Cook County Forest Preserve headquarters to perform their court-ordered community service. On that day, Rallings was assigned to be their driver. Rallings drove them to their jobsite in a white Ford F-350 twin-cabin dump truck. None of the men noticed anything unusual about Rallings' driving or behavior on the way to the job site.

¶ 5    For about three or four hours, Rallings and the other workers did field work, which included trimming grass, weeding, and picking up trash. At around 9 a.m., Billy Roumas, a supervisor, drove up and distributed bottled water to the workers. Rallings did not take a water.

¶ 6    At one point, a vehicle was parked in the way of the workers finishing their yard work, so Rallings kicked the vehicle and tried to push it.

¶ 7    At 10 a.m., Rallings drove the men to a Jersey Mike's restaurant for lunch. On the way there, he drove through a red light. Butler described Rallings as a "lead foot" and said that they made it to Jersey Mike's "on two wheels."

¶ 8    After lunch, they all got back into the truck and Rallings began to drive. One of the workers asked where they were going, to which Rallings answered, "basketball." He then made an illegal turn, "played chicken" with other cars, and sped "as fast as the truck would go." The workers yelled at Rallings to slow down. Butler testified that Rallings was driving 80 miles per hour. As they approached an intersection, the truck "jumped the median," and Butler passed out.

¶ 9    When Butler regained consciousness, he was in the back of the truck, "in bad shape." He managed to get out of the truck and saw Rallings outside the vehicle, chanting "I see you God." Rallings was then "taken down" by officers because he was resisting arrest. Butler saw them inject Rallings with something to calm him down.

¶ 10    Borja testified consistently with Butler's description of the events. He testified that after the collision, the driver of their truck kept asking "what happened, what happened?"

¶ 11    Giuseppe Gazzano, the driver of the second car that was stopped in the left southbound lane at the red light, was killed in the collision.

¶ 12    Linda Cobos, the driver of the first car stopped at the red light in the left southbound lane, testified that just before the crash, she heard a very loud noise, but because of the bend in the road, she could not see anything. Suddenly, she saw a truck driving north at a very high rate of speed, coming around the curve in the road. The truck collided with her car, and she sustained a foot fracture and a tear in her shoulder.

¶ 13    Philip Torgeson testified that he was the driver of a Dodge Durango, stopped southbound at the red light. The white forest preserve truck hit the front and driver side of his car. He saw the driver of the truck after, running around and screaming, "I hear you, Lord, I hear you, Jesus."

¶ 14    Elk Grove Village Investigator, Nicholas Langendorf, a traffic specialist certified in traffic reconstruction, responded to the crash scene. He described the scene as chaotic. Butler was screaming at Rallings, "you tried to kill me." The officers separated the men and tried to pull Rallings' arms behind his back. Rallings was tased twice. Once Rallings was handcuffed, he continued to resist. Eventually, paramedics medicated Rallings to calm him down.

¶ 15   Langendorf testified that Rallings had a distant look in his eyes when he was being restrained on the ground, and was yelling, "I see you God." He recorded the temperature at 88 degrees and sunny at the time of the collision.

¶ 16   Christopher Lunn, a firefighter paramedic with the Arlington Heights Fire Department, testified that when he arrived on the scene, he was assigned Rallings as his patient. When he approached Rallings, he saw "two law enforcement officers struggling with" Rallings, who was extremely "agitated and combative." He was "incoherent" and "screaming and yelling." Lunn made the decision to chemically restrain Rallings. After two injections, Rallings was able to tell Lunn his name, but was "saying he was seeing things," like "the three blind mice." Lunn rated him as "alert and oriented times one," which meant he was oriented to himself but did not know place, time, or events.

¶ 17   Lunn testified that he did a skin exam on Rallings and listed him as "diaphoretic," which meant he was "sweating profusely." Lunn also listed Rallings' chief complaint as "altered level of consciousness."

¶ 18   Nancy Eloise, a registered nurse, testified that Rallings was brought to Northwest Hospital's emergency department on the date in question. She remembered that he was "sweaty and worked outside." She testified that Dr. Donahue, whose first name was not included in the record, diagnosed Rallings with "acute delirium, secondary to heat exhaustion," and placed an order for sodium chloride in the amount of 2000 milliliters, which was administered with a bolus. Eloise testified that a bolus administers fluid faster than a traditional drip. Rallings' chart indicated that he was chanting, had some erratic behavior, and that he was not oriented to time or events.

¶ 19   Elk Grove Police Officer Veronica Rohman went to the hospital at around 11:30 a.m. to gather information on the crash. She interviewed Rallings without knowing he was the driver of

the truck. He told her that it was too hot after lunch, so they decided to head back in but then he "blanked out." Rallings expressed concerns about being fired and asked if anyone had been injured. He asked whether "you see three people before you die."

¶ 20    A police officer told Rallings later that afternoon that someone had died in the crash. Rallings was remorseful and crying, saying "I can't believe I killed someone."

¶ 21    Jennifer Bash, an expert in forensic toxicology, testified that no THC was found in Rallings' blood, but that two THC metabolites were found in his urine. She noted that the urine sample was not of a sufficient volume to determine the amount of THC in Rallings' urine. The presence of THC metabolites in the urine, but not the blood, indicated that the substance had already been excreted from the blood. According to Bash, after cannabis consumption, THC metabolites can remain in the urine for 12 to 24 hours. Bash testified that she reviewed a study that showed people who take marijuana can sometimes continue to experience signs of impairment even after THC was no longer detectable in their blood. Bash could not determine when Rallings had taken marijuana or whether he was impaired as a result.

¶ 22    Defense expert, Doctor James Merikangas, testified that he conducted an exam of Rallings on August 27, 2019. He administered the Minnesota Multiphasic Personality Inventory (MMPI), which showed that Rallings was not suffering from conditions besides a certain amount of anxiety and depression caused "by his situation that he was facing criminal charges."

¶ 23    According to Dr. Merikangas' report, delirium is defined as "a serious disturbance in mental abilities that results in confused thinking and reduced awareness of the environment." He explained that delirium has physical causes, including dehydration.

¶ 24    Dr. Merikangas testified that looking at Rallings' medical records, Rallings was "made better by giving a large amount of intravenous fluid," as indicated by the note that said "resolved"

by the acute delirium/heat exhaustion diagnosis. Dr. Merikangas also stated that the specific gravity of Rallings' urine was "at the maximum they could measure, and that was, also, resolved after they gave him fluid," which was a sign of "severe dehydration." Dr. Merikangas concluded that

> "[t]he fact that he got better when given the fluid was proof that he was severely dehydrated as the cause of his delirium. In other words, his mental state, his agitation, his delusions, his hallucinations, his seeing Jesus and seeing the blind mice, and his running around and, basically, fighting with – with the police was caused by this brain dysfunction of dehydration."

¶ 25    Dr. Merikangas further opined that he "believed that [Rallings] was not in control of his faculties" when he was speeding and failed to brake, and "that he was not aware of what he was doing because of the altered mental state brought on by the delirium." Dr. Merikangas described delirium as a complicated state where "people lose track of where they are, what they are doing. They can start seeing things that aren't there, hearing things that aren't there. Responding to inner thoughts that are not based in reality. It is being divorced from reality altogether."

¶ 26    Finally, Dr. Merikangas testified that delirium is not a persistent state and that it "waxes and wanes." It can be severe or mild. He stated that someone with acute delirium can still do some actions normally, "and then behave very bizarrely a moment later."

¶ 27    Doctor James O'Donnell, an expert in the field of pharmacology, testified that the toxicology results of Rallings' urine indicated that he was not under the influence of marijuana at the time of the collision.

¶ 28    It was stipulated that the local climatological data daily summary for the Chicago Palwaukee Airport region indicated the temperature on June 30, 2018, was "95-plus degrees."

¶ 29     The court then made its ruling. It stated that it could not find beyond a reasonable doubt that Rallings was under the influence of THC. No witnesses testified that they observed Rallings consume marijuana, or that they smelled marijuana on his person. No marijuana was recovered from his person, belongings, or vehicle. The court noted that the hospital records indicated that Rallings' blood was drawn one hour after the accident, and two drug screening blood tests were performed: one at the hospital and one at the Analytical Forensic Testing Laboratory. Both blood tests were negative for THC. A urine sample was collected at the hospital that same afternoon, which revealed an unquantified presence of a THC metabolite. The second test at the analytical lab disclosed the presence of two cannabis metabolites, but because of the insufficient sample size, the lab was unable to assert any levels. Dr. O'Donnell opined that Rallings was not under the influence of THC at the time of the accident because without THC in the blood, there is not potential for THC to "psychoactively affect the brain." The court stated, "[a]ny suggestion that THC triggered the defendant's behavior around the time of the accident has been dispelled by the fact that no THC was detected in the defendant's blood taken one hour after the crash." Accordingly, the court found that the State failed to prove Rallings was under the influence of THC at the time of the accident, and Rallings was not guilty of Counts 1, 3, 4, and 5, which were the aggravated DUI counts.

¶ 30     The court then turned to Count 2, the reckless homicide count. It noted that the statute provides that a person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts, whether lawful or unlawful, which cause the death, are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of death consists of the driving of a motor vehicle, in which case the person commits reckless homicide. 720 ILCS 5/9-3(a) (West 2018).

¶ 31     The court also noted that a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 32     The court stated that the statute "does not delineate degrees of consciousness," and therefore "the legislature intended for the word conscious to have its common and ordinary meaning which means simply being awake." The court stated that just before the accident, Rallings "had the conscious wherewithal to choose a particular restaurant, drive to that restaurant, go inside, order food, eat it, leave the restaurant, although delirium was setting in because of heat and dehydration and he was acting strange."

¶ 33     The court noted that Linda Cobos had testified that Rallings was able to navigate a curve in the road just before the accident, "signaling to her that the driver was not drunk or rendered unconscious by something such as a heart attack." The court noted that another witness testified that Rallings had his eyes wide open during the collisions, which "signif[ies] consciousness." The court stated that while Rallings "may have been experiencing delusions, he was not unconscious." The court stated that Dr. Merikangas did not testify that Rallings was unconscious, but rather that he suffered from "altered consciousness as a symptom of acute delirium caused by dehydration." The court then stated:

> "Under 720 ILCS 5/4-1, a material element of every offense, is a voluntary act,
> which includes an omission to perform a duty which the law imposes on the
> offender and which he is physically capable of performing. Caselaw *** defines
> the term voluntary as bodily movements controlled by a conscious mind. Here, as
> noted, the defendant was conscious before, at the time of, and after the accident.

The voluntary act statute also does not speak in degrees or contain qualifiers. The accident in this case was a product of the defendant performing a physical act while conscious, that is, significantly depressing the acceleration pedal on the Ford F-350 truck and omitting engagement with the brake pedal. The State has proven the voluntary act material element with respect to the reckless homicide charge beyond a reasonable doubt."

¶ 34 The court found that the State proved the essential elements of the reckless homicide charge beyond a reasonable doubt and found him guilty on that count.

¶ 35 On June 21, 2023, a hearing on Rallings' motion to reconsider was heard. Defense counsel argued that the standard was not "whether Mr. Rallings was simply conscious or not, whether he was awake or not," but rather if there is a "conscious disregard of a danger." Defense counsel argued that because of Rallings' delirium and dehydration, he was not aware of his actions. The court responded that it would adhere to its findings at the conclusion of the bench trial, and that the critical issue "revolves around the meaning of a voluntary act." The court stated that it "made the legal finding that a voluntary act is a physical act which is a product of a conscious mind." And then, it found that the State proved beyond a reasonable doubt that Rallings was "conscious at the time of the offense."

¶ 36 During sentencing, the trial court stated, "I do believe that the defendant was suffering from delirium, although he was not rendered unconscious." Noting that Rallings had already spent five years on electronic monitoring and home confinement, without violations, the court sentenced Rallings to two years' probation. Rallings now appeals.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, Rallings contends that the trial court misunderstood the definition of a voluntary act, and that the State failed to prove the element of a voluntary act beyond a reasonable doubt.

¶ 39    Rallings was convicted of reckless homicide pursuant to section 9-3(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-3(a) (West 2018)), which states:

"(a) A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving a motor vehicle *** in which case the person commits reckless homicide."

¶ 40    The term "recklessness" is defined in the Code as follows:

"A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and the disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 41    Finally, the Code states that "[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4-1 (West 2018). It is a fundamental principle that a person is not criminally liable for an involuntary act. *People v. Grant*, 71 Ill. 2d 551, 558 (1978). Our supreme court in *Grant* discussed the voluntary act requirements as follows:

"Certain involuntary acts, *i.e.*, those committed during a state of automatism, occurs as bodily movements which are not controlled by the conscious mind. A person in

a state of automatism lacks the volition to control or prevent the involuntary acts. Such involuntary acts may include those committed during convulsions, sleep, unconsciousness, hypnosis, or seizures. A cornerstone of the defense of involuntary conduct is that a person, in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally liable for such involuntary acts." Citations omitted. 71 Ill. 2d at 558.

¶ 42    The *Grant* court noted that the committee comments to section 4-1 of the Criminal Code of 1961 cited to the Model Penal Code's provision on the voluntary act requirement. The Model Penal Code states that the following are not voluntary acts: (a) a reflex or convulsion; (b) a bodily movement during unconsciousness or sleep; (c) conduct during hypnosis or resulting from hypnotic suggestion; (d) a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual. Model Penal Code § 2.01(2) (1962).

¶ 43    "Thus, the law is clear that where a bodily movement is not the result of a defendant's volition or control, it is an involuntary act for which the defendant cannot be held criminally liable." *People v. Nelson*, 2013 IL App (3d) 120191, ¶ 28; see also *People v. Martino*, 2012 IL App (2d) 101244, ¶ 15 (where police used a Taser on the defendant, rendering him incapable of controlling his muscles, and the defendant fell on the victim, the contact with the victim was the result of an involuntary act, which could not sustain an aggravated domestic battery conviction).

¶ 44    We first address Rallings' contention that the trial court improperly defined a voluntary act. We review questions of statutory construction *de novo*. *People v. Terrell*, 339 Ill. App. 3d 786, 789 (2003) (although couched in terms of the sufficiency of the evidence, "the defendant's argument really goes to the definition of the words 'to commit' in the solicitation statute," which is reviewed *de novo*.)

¶ 45    The trial court properly noted that pursuant to section 4-1 of the Code, a material element of every offense is a voluntary act. 720 ILCS 5/4-1 (West 2018). The court then stated that case law defined a voluntary act as "bodily movements controlled by a conscious mind." During the hearing on Rallings' motion to reconsider, the trial court described a voluntary act as "a physical act which is a product of a conscious mind." Looking at the case law, these were proper statements of law defining a voluntary act. See *Grant*, 71 Ill. 2d at 558 (involuntary acts are "bodily movements which are not controlled by the conscious mind."). While the trial court did state that "the legislature intended for the word conscious to have its common and ordinary meaning which means simply being awake," that statement was made in the context of recklessness, and not in determining whether there was a voluntary act.

¶ 46    The question now becomes whether the State proved the element of a voluntary act beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 33. All reasonable inferences form the evidence must be drawn in favor of the prosecution, and we will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*.

¶ 47    In a bench trial, it is for the trial court sitting as the trier of fact, to determine the credibility of witness, to weigh evidence, and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). When faced with conflicting versions of events, a factfinder is "entitled" to choose among them and is not obligated to accept the defendant's version. *People v. Villarreal*, 198 Ill. 2d 209, 231 (2001). This is true for

both expert opinions and lay witnesses, and a trier of fact need not accept the opinions of a defendant's expert witness. *People v. Dresher*, 364 Ill. App. 3d 847, 855-56 (2006). "In situations where medical experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is determined by the trier of fact." *People v. Klein*, 2015 IL App (3d) 130052, ¶ 101.

¶ 48 Here, the evidence showed that after the workers completed their work, Rallings was able to pick a restaurant, drive to the restaurant, and order lunch. After lunch, he was able to maneuver the vehicle around other cars at a high rate of speed, and just before the crash, he was able to follow the curve of the road. While he appeared disoriented after the crash, he was "oriented to person and place" upon his arrival at the emergency room. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could find that Rallings was acting voluntarily when he accelerated the vehicle at a high rate of speed and failed to brake. While the trial court found that delirium was "setting in" after lunch, Dr. Merikangas testified that delirium can ebb and flow, and is not a constant state. While this court may have reached a different conclusion had we been the trier of fact, the resolution does not turn on what a different trier of fact may have done. See *People v. Grunin*, 2022 IL App (1st) 200598, ¶ 65. Rather, as discussed, we must determine whether *any* rational trier of fact could have found Rallings guilty when the totality of the evidence is viewed in the light most favorable to the State. Here, we cannot say that the trial court's finding that Rallings committed a voluntary act when he accelerated at a high rate of speed and failed to brake was so unreasonable, improbable, or unsatisfactory such that no rational trier of fact could have found the same beyond a reasonable doubt. *Cline*, 2022 IL 126383, ¶ 33.

¶ 49 Rallings maintains, relying on *People v. Nelson*, 2013 IL App (3d) 120191, that because Dr. Merikangas' testimony was not rebutted by a State expert, the trial court was compelled to

adopt it. In *Nelson*, the defendant was convicted of four counts of phone harassment, and he appealed. On appeal, the court found that the evidence was insufficient to show that the defendant performed voluntary acts when he made offensive telephone calls, because of his Tourette Syndrome. *Id*. ¶ 29. The court found that the expert testimony, along with the defendant's own testimony, demonstrated "that the phone calls were not acts done under [the defendant's] conscious control." *Id*. The expert testimony testified that patients with Tourette Syndrome could perform complex actions as part of involuntary tics and described Nelson's tic as "an automatic stimulus response" where cognitive control was not possible. *Id*. The court noted that the State did not present a rebuttal expert to testify that the defendant's actions were voluntary, or to otherwise refute any of the doctor's testimony. *Id*. The court stated that the trial court "concluded that it had to adopt Dr. Fields' uncontroverted expert testimony that [the defendant] did not act voluntarily in making the phone calls, which was proper." *Id*. (citing *Morus v. Kapusta*, 339 Ill. App. 3d 483, 492 (2003) (holding that the trier of fact cannot disregard uncontroverted expert testimony when this testimony pertains to medical issues "beyond the understanding of a layperson")).

¶ 50    In the case at bar, while Dr. Merikangas opined that Rallings acted involuntarily due to his dehydration-based delirium, he also opined that a delirium state can ebb and flow and is not a constant state. This is in direct contrast to the expert witness's testimony in *Nelson*, which was that Tourette Syndrome is "an automatic stimulus response" where cognitive control is not possible. *Id*. Moreover, as noted above, a trier of fact need not accept the opinions of a defendant's expert witness, and the weight to be accorded that expert witness's testimony is determined by the trier of fact. *Dresher*, 364 Ill. App. 3d at 855-56; *Klein*, 2015 IL App (3d) 130052, ¶ 101. Accordingly, we find Rallings' reliance on *Nelson* to be unpersuasive.

¶ 51                              III. CONCLUSION

- 14 -

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.