# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***People v. Zirko*, 2012 IL App (1st) 092158**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN ZIRKO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-2158 |
| Filed<br>Rehearing denied<br>Modified upon denial<br>of rehearing | June 5, 2012<br>August 17, 2012<br><br>August 21, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first-degree murder and solicitation of murder were upheld over his contentions that the trial court erred in giving an instruction on accountability for murder, admitted evidence of defendant's Internet search history and denied his motion to quash his arrest and suppress evidence, that the State failed to prove he committed the offenses, that his counsel was ineffective in requesting joinder of the charges, that the trial court failed to comply with Supreme Court Rule 431(b), and that a proper inquiry should be conducted on his *pro se* claims of ineffective assistance of counsel. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 05-CR-1516, 05-CR-6560; the Hon. Timothy J. Chambers, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Heidi Linn Lambros, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Ashley A. Romito, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Presiding Justice Quinn and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1        This appeal arises from a July 21, 2009 judgment entered by the circuit court of Cook County which found the defendant-appellant, Steven Louis Zirko (Zirko), guilty of two counts of first-degree murder and one count of solicitation of murder. Zirko was sentenced to two natural life sentences for murder and a concurrent 30-year sentence for solicitation of murder. On appeal, Zirko argues that: (1) the trial court erred when it instructed the jury on the theory of accountability for the murder charges; (2) the trial court erred when it admitted evidence of Zirko's Internet search history; (3) the trial court erred when it denied Zirko's motion to quash arrest and suppress evidence; (4) the plaintiff-appellee, the People of the State of Illinois (State), failed to prove beyond a reasonable doubt that Zirko committed murder; (5) Zirko's trial counsel was ineffective for requesting that the solicitation of murder and murder charges be joined; (6) the State failed to prove beyond a reasonable doubt that Zirko committed solicitation of murder; (7) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); and (8) this matter should be remanded for a proper inquiry into Zirko's *pro se* claims for ineffective assistance of counsel. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                        BACKGROUND

¶ 3        On December 13, 2004, Mary Lacey (Mary) and Margaret Ballog (Margaret) were found dead in Mary's house at 1901 George Court, Glenview, Illinois. On January 12, 2005, Zirko was charged with the first-degree murders of Mary and Margaret, and with solicitation of murder. The trial commenced on June 8, 2009 in the circuit court of Cook County.

¶ 4        Zirko began dating Mary in 1994. At that time, Mary had two children from a previous marriage, Susan Lacey (Susan) and Raymond Lacey (Ray). In 1994, Mary, Zirko, Susan and Ray moved to Fort Lauderdale, Florida. Mary and Zirko then had two other children; Zachary, born in 1996, and Dylan, born in 1998. Susan and Ray testified that Zirko began

-2-

physically abusing Mary after Dylan was born. Ray testified that in March 2000, Ray was at his aunt Stephanie's house when Mary ran in crying and stated that Zirko hit her. On December 26, 2002, Ray and Susan witnessed Zirko hit Mary in the mouth, knocking her to the floor. In spring 2003, Mary and Zirko ended their relationship and Mary, Ray, Zachary and Dylan moved to 3120 N. Parkside, Park Ridge, Illinois (Park Ridge house). Zirko moved in with his parents at 5806 N. Richmond, Chicago, Illinois (Zirko's house).

¶ 5      Mary received an order of protection against Zirko and set up a system for the children's visitation with Zirko in which Zachary and Dylan would get dropped off at the home of Mary's sister, Tracy Youhanna's (Tracy) house, and Zirko would pick them up from Tracy's house for visitation. Ray testified that this system was established because Mary did not want Zirko to know where they lived. On September 13, 2003, Irma Delaguardia (Irma) testified that she lived across the street from Mary and saw Zirko approach Mary's minivan, which was parked in front of the Park Ridge house. Irma testified that Zirko took something out of the minivan, walked up to the front of Mary's building where the mailboxes were located, then returned to his car and drove away. On that same day, Ray testified that he was driving to his girlfriend's house when he saw Zirko's car parked down the street from the Park Ridge house. Ray continued driving down the street past Zirko's car and Zirko began to follow him. Zirko followed Ray for a few turns and then Ray got scared and drove home. On December 9, 2003, Zirko was convicted of violating the order of protection. In October 2004, Mary, Zachary and Dylan moved to 1901 George Court, Glenview, Illinois (Mary's house).

¶ 6      On December 3, 2003, Zirko went to an appointment with his chiropractor, Dr. Chard Larson (Dr. Larson). Dr. Larson had treated Mary, Zirko, Zachary and Dylan over a period of time. Dr. Larson testified that during the December 3, 2003 appointment, Zirko was very upset and was complaining about Mary using his minivan and getting tickets. Zirko asked Dr. Larson if he knew anyone that could help him get his minivan back, and Dr. Larson gave Zirko's phone number to Perry Maslo (Perry). Perry met with Zirko in January 2004. Perry testified that Zirko complained about Mary and said that he wanted his kids back. Perry also testified that Zirko said that he wanted to "off" Mary. Perry told Zirko that he would have to think about it and that they should have another meeting. At their second meeting, Zirko brought a picture of Mary and said that he wanted her "offed." Perry suggested planting drugs on Mary instead, but Zirko refused and said that he still wanted her "offed." Perry agreed to run surveillance on Mary for $1,000. Zirko paid Perry and after Perry followed Mary once, he asked Zirko for more money. Zirko refused and his communication with Perry ended.

¶ 7      Throughout 2004, Zirko had several appointments with Dr. Larson. Dr. Larson testified that Zirko became increasingly upset over his situation with Mary. Dr. Larson testified that Zirko asked him if he knew anyone who could break Mary's legs. Dr. Larson felt at that point that Zirko was just venting. At a subsequent appointment, Zirko told Dr. Larson that breaking Mary's legs would not be enough, and Zirko asked Dr. Larson if he knew anyone that would kill Mary. Dr. Larson testified that he told Zirko that he would "look into it," but had no intention of actually following through. Dr. Larson felt that he had control of the situation and could calm Zirko down by saying he would look into Zirko's requests. Dr. Larson testified that Zirko's requests became more real to him when Zirko told Dr. Larson that he

had a $25,000 life insurance policy and $10,000 cash that he would pay to someone to kill Mary. Zirko talked about this multiple times and repeatedly asked Dr. Larson if he had found anyone to kill Mary.

¶ 8 In June 2004, Zirko told Dr. Larson that he would be traveling to Australia with his girlfriend, Kelly St. John (Kelly). Zirko said this would be a perfect time for someone to kill Mary because he would have the alibi of being out of the country. Dr. Larson told Zirko he would look into it. While in Australia, Zirko called Dr. Larson numerous times and left messages asking whether it was time for him to come home. Dr. Larson understood the messages to mean that Zirko was inquiring whether he had found someone to kill Mary. On July 9, 2004, Zirko had another appointment with Dr. Larson. Zirko told Dr. Larson that he was upset that his plan to have Mary killed while he was in Australia did not happen. At this point, Dr. Larson told Zirko that he would never find someone to kill Mary. Zirko left Dr. Larson's office angrily, and Dr. Larson did not expect to see him again.

¶ 9 However, on October 1, 2004, Zirko visited Dr. Larson's office for a scheduled appointment. Zirko told Dr. Larson that he had a plan to kill Mary and he needed Dr. Larson's help in establishing an alibi. Zirko told Dr. Larson that he would start a pattern of visits to Dr. Larson's office. Zirko said that once the pattern was established, he would need Dr. Larson to swipe his credit card to show that he was at Dr. Larson's office when he really was not there. Zirko told Dr. Larson that this would need to take place at his Palatine office rather than his Chicago office because the Palatine office did not have security cameras. Dr. Larson claimed that he agreed to help Zirko with the alibi because he was scared. Dr. Larson swiped Zirko's credit card the following Friday even though Zirko was not there.

¶ 10 Dr. Larson soon felt that he no longer had control of the situation and contacted a friend, Darryl Daley (Detective Daley), who was a detective for the Chicago police department. Detective Daley told Dr. Larson to tell Zirko that he found someone to kill Mary so they could insert another officer into the situation to pose as the killer. On October 13, 2004, Dr. Larson met with Zirko again. Dr. Larson told Zirko that he found someone to kill Mary and asked if Zirko wanted to meet the killer. Zirko refused and said that he was going to get his father to help him since his father was a bagman for the mob and was the only person he could trust. Zirko told Dr. Larson that the plan was well thought out and they were going to do a few dry runs. Zirko mimed a gunshot during their conversation about the plan. Zirko also asked Dr. Larson to swipe his credit card the following morning. Zirko called Dr. Larson the next day and told Dr. Larson that he did not need help anymore. Dr. Larson called Detective Daley because he was worried that Zirko knew he had spoken with police. Detective Daley told Dr. Larson to contact the Palatine police because the conversations with Zirko took place in Palatine.

¶ 11 On October 15, 2004, Dr. Larson met with two detectives from the Palatine police and said that he would cooperate with the police. The detectives asked Dr. Larson if he was willing to wear a wire and gave him a deadline of October 18, 2004 to decide. In the meantime they set up watch on Mary's house and talked to Mary about the murder-for-hire allegations. Dr. Larson failed to respond to the detectives by the October 18 deadline, so they decided to bring Zirko in for questioning. After speaking to Zirko on October 18, 2004, the detectives released Zirko without charging him and closed the case.

¶ 12        William Heichman (William) testified that he attended anger management classes with Zirko in September and October 2004. William testified that Zirko asked him for help in finding a gun. He told Zirko that he would talk to his cousin about getting a gun. Zirko also offered William $10,000 to intimidate Mary because she would not let Zirko see his kids. Mike Lazar (Mike) also testified that he attended anger management classes with Zirko. Zirko asked Mike if he knew anyone that could "exterminate" Mary. Zirko told Mike that he could offer $50,000 to anyone that could do the job. Mike did not take Zirko seriously and thought that someone was trying to set him up.

¶ 13        Kelly testified that she started dating Zirko in March 2004. During their relationship, Zirko worked as piano player on commercial cruise lines, and Kelly would accompany him on cruises. Zirko often stayed with her at her condo in Chicago Ridge, Illinois. Zirko also frequently used her computer and her jeep. Kelly testified that Zirko began complaining about Mary in October 2004. In November 2004, Zirko went with Kelly to a hospital clinic where Kelly had hand surgery. He took some latex gloves from the clinic. On December 6, 2004, Kelly and Zirko had a conversation about Mary preventing Zirko from seeing his kids. Afterwards, Zirko asked Kelly if she "knew anyone." Kelly got very upset and told Zirko not to talk that way. Zirko stayed with Kelly every night from December 6 to the morning of December 13, 2004. On December 9, 2004, Zirko went to court on a child custody matter. On December 11, 2004, Kelly and Zirko filled Kelly's jeep with gas after seeing a movie. Later that night Zirko began complaining of an upset stomach. On December 12, 2004, Kelly and Zirko went grocery shopping and then returned home. Zirko offered to take Kelly's jeep in for an oil change the next day. From when they filled up the gas tank in Kelly's jeep on December 11 to the morning of December 13, 2004, they only drove 5 or 10 miles. On December 13, 2004, Zirko dropped off Kelly at a train station near her house around 8 a.m.

¶ 14        Kelly testified that on December 13, 2004, Zirko was wearing green khaki pants, a black sweater, a long green trench coat, and all-white leather tennis shoes when he dropped her off. At 2:20 p.m., Kelly got a voicemail message from Zirko's mother saying that Mary was injured. When Kelly talked to Zirko later that day, Zirko said that he had been at home sick all day and did not take her jeep in for service. He asked Kelly not to tell anyone about their relationship and to say that he had been at his parents' house all weekend. Zirko called later on and said that he had nothing to do with what happened to Mary. Shortly after, Kelly received another call from Zirko's mother. After the conversation, Kelly went downstairs to look at her jeep. She noticed that there were several "white marks" and "white liquid" was spilled inside her jeep. Kelly testified that the white marks and white liquid were not on her jeep when Zirko dropped her off in the morning. Kelly began trying to clean the white marks, and turned on her jeep to stay warm. She then noticed that there was only a half-tank of gas left.

¶ 15        On December 14, 2004, Kelly took her jeep to the dealership for an oil change. When she picked up her jeep she noticed that the white marks were still there and she tried to clean them with wipes that she had purchased. Again, she was unsuccessful and placed the wipes in her work bag. At 9:30 p.m., the Glenview police came to her door. Kelly initially told the detectives that she had not seen Zirko in a few days and that he was at his parents' house the whole weekend. She showed the detectives her jeep and then returned to her condo. After she

returned to her condo she became upset and called her mother, and her mother told her to tell the police the truth. Kelly then went back downstairs and invited the detectives back into her condo. She told them about Zirko's whereabouts over the weekend and Monday morning, how he advised her not to tell anyone about their relationship, and about the white marks on her jeep. Kelly looked at a picture of Zirko wearing sweat pants, a jacket, and Converse shoes and said that he was not wearing those clothes when he dropped her off on December 13, 2004. Kelly gave the detectives consent to search her jeep and identified Zirko's day planner which had "1901 George Court" written in it. She testified that Zirko had eczema but did not see any cuts or scrapes on his hands when he dropped her off.

¶ 16    Gary Ritchko (Gary) testified that he began dating Mary in April 2003 and lived with her, Zachary, and Dylan at Mary's house. Mary broke her ankle on December 8, 2004, so her mother Margaret was staying at the house to help them with the kids. On December 13, 2004, Gary left the house at 8:30 a.m. to meet his lawyer. Mary dropped the kids off at school and returned home to wait for Comcast to install a land line. Mary wanted a land line installed because she was afraid of Zirko. At 10 a.m., Gary got a call from Comcast saying that they would be at the house before noon. Mary's nephew testified that he was at his parents' house and heard the phone ring at 10:22 a.m. He did not answer it but heard Mary leaving a message on the answering machine. At 11:05 a.m., Gary got call from a Comcast technician saying that no one was answering at Mary's house.

¶ 17    Tracy testified that she talked to Mary at 10:15 a.m. and arranged to drop her daughter off at Mary's house later that morning. Tracy left her house around 11:15 a.m. and stopped at Burger King. Tracy called to ask Mary what she wanted from Burger King but no one answered. Tracy then pulled up to Mary's house and saw the Comcast technician outside the house. Tracy opened the front door and saw Margaret lying near the front door covered in blood. As she entered the house, she also saw Mary laying in the doorway to her bedroom covered in blood. Tracy testified that Zirko called her in July 2003 and threatened to "demolish" Mary's face. Tracy testified that neither Mary nor Margaret would have allowed Zirko into the house.

¶ 18    Evidence technicians from NORTAF, an investigative unit made up of members from police departments of 13 municipalities, began processing the crime scene around 12:30 p.m. on December 13, 2004. Evidence Technician Michael Wasowicz (Technician Wasowicz) photographed and videotaped the scene. He testified that there was no sign of forced entry. Technician Wasowicz collected four shell casings from inside the house, found a bloody partial shoe impression in the living room, and noticed blood near the door knob on the front door. Evidence Technician Lawrence Yocus collected bullet fragments, shell casings, and trace evidence including fibers, and measured blood spatter. None of the trace evidence recovered could be attributed to Zirko. Two sets of tire tracks were found near the driveway of the house, but the impressions did not match Zirko's car or Kelly's jeep. Technician Wasowicz testified that, although Zirko's fingerprints, DNA and hair were not found at the scene of the crime, that does not mean that he did not commit the murders.

¶ 19    Dr. Mitra Kalaleker performed the autopsies on Mary and Margaret. Margaret was shot three times and died as a result of the gun shot wounds. Mary was stabbed 48 times, including a cut to her jugular. Mary was also shot three times. Mary died as a result of the

stab wounds with the gun shot wounds acting as a significant contributing factor.

¶ 20    Zirko's cousin Stephanie Primo testified that she called Zirko's house and went over to the house around 2 p.m., but no one answered. Zirko called her back and said that he had been at home sick all day. Zirko's neighbor, Vincent Vaccarella, testified that when he came home at 10:30 a.m., he did not see Zirko's car parked in its usual spot on the street. Evidence technicians also recovered a McDonald's bag in the kitchen of Zirko's house with a receipt dated December 13, 2004 at 2:21 p.m. This receipt matched an identical McDonald's receipt found in Kelly's jeep.

¶ 21    Around 3 p.m., Sergeant Richard Benbow (Sgt. Benbow) and Sergeant William Stutzman (Sgt. Stutzman) of the Wheeling police department went to Zirko's home and found his car parked on the street. Around 5:50 p.m., they approached Zirko's house. Zirko's mother let the sergeants inside. The sergeants observed Zirko wearing sweats, a long-sleeve shirt, and socks. The sergeants asked Zirko if he would come to the police station with them. Zirko stated that he talked to his attorney and was advised not to say anything about Mary directly. The sergeants asked Zirko if he would still be willing to go with them to the station and Zirko said yes. Zirko was not handcuffed and walked to the police car himself.

¶ 22    The sergeants and Zirko arrived at the Glenview police station at approximately 6:40 p.m. The sergeants brought Zirko to an interview room and read him his *Miranda* rights. Zirko refused to sign a *Miranda* waiver but agreed to talk to the sergeants. The sergeants talked with Zirko until 7:10 p.m. when they took a five-minute break to discuss their strategy. They returned to the interview room and spoke to Zirko from 7:15 to 7:30 p.m. The sergeants asked him about his background, where he lived, his children, his occupation and if he was dating anyone. Zirko said that he was not dating anyone and heard about what happened to Mary from relatives. Zirko told Sgt. Benbow that he was checking his email from 10 a.m. to 11 a.m. and again between 3 p.m. and 5 p.m. Zirko confirmed that he called his attorney, Patrick Reardon (Attorney Reardon) at 10:14 a.m. Zirko's hands were photographed to document scrapes and abrasions. Zirko's hands were also swabbed to be tested for gunshot residue (GSR). Technician Wasowicz inventoried Zirko's shoes.

¶ 23    Trace Evidence Analyst Robert Berk (Analyst Berk) analyzed Zirko's hand swabs. Analyst Berk testified that Zirko's left palm, the back of his left hand, and right palm tested negative for GSR. The back of Zirko's right hand tested positive for GSR. Analyst Berk testified that this meant that Zirko either fired a gun, was in the proximity of a gun that was fired, or had contact with something that had GSR on it. Analyst Berk could not conclude which of the possibilities caused Zirko's hand to test positive for GSR. Analyst Berk stated that it is possible for GSR to be transferred from the back of a police car, or tables in police stations, onto a person's hands. Also, Analyst Berk testified that if a person was wearing a glove they could still have GSR particles on the part of their arm that was not covered, and the low number of particles on Zirko's hands indicated that he washed his hands before going to the police station.

¶ 24    Detective Jim Chartier (Detective Chartier) examined Kelly's jeep. Detective Chartier took samples of white powdery residue from the plastic surfaces in the jeep, the brake pedal and the dashboard. He also found a day planner with "1901 George Court" written inside.

The parties stipulated that the residue was a sodium chloride composition, and that when bleach dries, it leaves sodium chloride. None of the trace evidence from the jeep came from Mary, Margaret, or Mary's house. Detective Chartier tested the jeep for blood using both luminol and phenolthalein. If the tests using either substance are positive, further tests must be conducted to determine who the DNA belongs to. The luminol test is the more sensitive test, and it reacts to blood samples that are more diluted than samples the phenolthalein test is capable of detecting. However, it is also more prone to producing false-positive test results. Detective Chartier observed a positive reaction to the luminol test on the driver's side brake pedal, the driver's side floor mat, and the driver's seat. The only area that resulted in a positive reaction for the phenolthalein test was the passenger seat area.

¶ 25    Defense counsel's expert in DNA testing, Dr. Robert Benjamin, reviewed the DNA samples from the jeep. He stated that the samples were mixed because they could not be attributed to just one person. He testified that Mary was not a good candidate for being a contributor to any of the DNA samples, but could not definitively conclude that Mary was not a contributor.

¶ 26    Officer Dan Weber testified as to the items confiscated from Zirko's house. The police seized Zirko's cell phone and computer. The police also recovered two life insurance policies. One had a benefit of $500,000 on Mary's life and the other had a $150,000 benefit on Margaret's life. Zirko was the beneficiary of both policies.

¶ 27    Computer Forensic Investigator Luby Novitovic (Investigator Novitovic) testified that he examined Zirko's and Kelly's computers. Investigator Novitovic testified that he found the following Internet activity on Zirko's computer: a search was made on www.MapQuest.com dated September 13, 2003, for 3120 N. Parkside, Park Ridge, Illinois; a search for "GHB" was made; the web site www.legalsteroids.com/google/GHB was accessed; a Map Quest search from Zirko's house to 2031 N. Parkside Drive, Park Ridge, Illinois was made; the web site www.anesthesia-nursing.com/ether was accessed; in September 2003, there were searches performed for "nitrous oxide," "unconscious" and "liquid," and "contract" and "killer"; the web site www.evidence-eliminator.com was accessed; on January 6, 2004 there was a search made at www.realtor.com for homes in the 60091 zip code for up to $300,000; in August 2004, there were searches performed for "hire plus mercenary," "private detective," "private detective Chicago," "Chicago, private detective," and "mercenary for hire"; in August 2004, the web pages www.private-investigator.com, www.youspystore.com, and www.homestore.com were accessed; and a search was made on www.realtor.com for homes in the 60091 zip code for the maximum price of $325,000. None of these searches were conducted while Zirko was traveling. Also, Internet Explorer was not used while Zirko was traveling.

¶ 28    Investigator Novitovic testified that he found the following Internet activity on Kelly's computer: in August 2004, searches were made for "gun shows" and "hire a hitman"; in August 2004, the web pages www.hireahitman.com, www.gunshows.usa.com.florida, www.gunshows.usa.com, www.usa.com.iowagunshows, www.gunshowsusa.com.illinois, and www.gunshowuse.com.indiana were accessed; a search on www.realtor.com was performed for houses with three bedrooms in Park Ridge between $150,000 and $200,000; an October 2004 Map Quest search from Zirko's house to Mary's house was made; in

December 2004, searches were made for "Henking and calendar" and "Glenview School District 34"; and the web page www.glenview34.org was accessed. Kelly testified that she did not perform any of these searches or access any of these web pages.

¶ 29 At trial, defense counsel objected to the jury being instructed on the theory of accountability for first-degree murder. Defense counsel argued that the State did not offer any evidence that Zirko was accountable to someone else. In response, the State argued that the evidence of Zirko's computer searches for hire a hitman and mercenary, Zirko asking people to intimidate his wife, Zirko telling Dr. Larson that his father was going to help him, and the GSR results, all supported the alternate theory of accountability. The trial court allowed the accountability instruction over defense counsel's objection. During deliberations, the jury asked "is the solicitation charge only for Chad Larson or is it as a whole?" The jury was told to follow its instructions and continue to deliberate.

¶ 30 On June 24, 2009, Zirko was convicted of two counts of first-degree murder and one count of solicitation of murder. Zirko sent to the court a *pro se* motion for new trial based on ineffective assistance of counsel, which was stamped "Received" by the clerk of the court on July 15, 2009. This motion was not file stamped and was never ruled on by the trial court. On July 21, 2009, the trial court entered judgment on the jury's verdict. On that same day, Zirko's trial counsel filed a motion for new trial. The trial court denied counsel's motion. The trial court sentenced Zirko to two natural life sentences for the murders and a concurrent 30-year sentence for solicitation of murder. Zirko filed a notice of appeal on August 13, 2009.

¶ 31 ANALYSIS

¶ 32 We first examine Zirko's argument that the trial court erred when it instructed the jury on the theory of accountability for the murders of Mary and Margaret. When considering the trial court's decision to give a jury instruction, the reviewing court applies the abuse of discretion standard of review. *People v. Jones*, 219 Ill. 2d 1, 31, 845 N.E.2d 598, 614 (2006). A trial court abuses its discretion when its decision is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359, 808 N.E.2d 496, 500 (2004).

¶ 33 A defendant is accountable for another person's conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2004). Zirko argues that the State presented no evidence to support that Zirko was accountable to another person and, therefore, the instruction on the theory of accountability was improper. Zirko also claims that the State's theory throughout the trial was that Zirko was the principal in the murders of Mary and Margaret.

¶ 34 In support of his argument, Zirko cites multiple cases that have held that an accountability instruction was improper where the evidence established that the defendant was either guilty as the principal or not guilty. *People v. Williams*, 161 Ill. 2d 1, 51-52, 641 N.E.2d 296, 317-18 (1994); *People v. Lusietto*, 41 Ill. App. 3d 205, 207-08, 353 N.E.2d 385,

387-88 (1976). However, we find that Zirko's reliance on these cases is misplaced. Even though delivering an instruction on accountability in absence of supporting evidence is error, it is proper to instruct a jury on both the theories of the defendant's guilt as the principal and through accountability where the evidence supports both theories. *People v. Batchelor*, 202 Ill. App. 3d 316, 331, 559 N.E.2d 948, 958 (1990).

¶ 35    In making his argument, Zirko failed to consider that the instruction on the theory of accountability is only improper when there is *no evidence whatsoever* to support the notion that the defendant was acting as an accessory. See *Williams*, 161 Ill. 2d at 51-52, 641 N.E.2d at 317-18; *Lusietto*, 41 Ill. App. 3d at 207-08, 353 N.E.2d at 387-88. A jury instruction on the issue is justified if the State submits *even the slightest* evidence to support a theory of accountability, and evidence of accountability may be circumstantial. *People v. Beltran*, 327 Ill. App. 3d 685, 692-93, 765 N.E.2d 1071, 1077-78 (2002). Moreover, "[e]vidence, however slight, on accountability along with evidence of action as a principal offender is sufficient to support both instructions regardless of whether both theories were advanced in the State's case in chief." *Batchelor*, 202 Ill. App. 3d at 331, 559 N.E.2d at 958. The State is entitled to instruction on the theory of accountability where there is evidence showing the defendant's participation both as a principal and an assistant in commission of the offense. *People v. Quiroz*, 253 Ill. App. 3d 739, 749, 625 N.E.2d 856, 864 (1993).

¶ 36    In this case, there was a large amount of evidence supporting the theory that Zirko was accountable to another person, including: that there was a history of domestic violence between Zirko and Mary; that Zirko spoke about offering money to multiple people to kill Mary; that Zirko asked Dr. Larson to find someone to kill Mary for him on multiple occasions; that Zirko solicited others to harm or intimidate Mary; that Zirko conducted Internet searches for finding a hitman and mercenary; that Zirko claimed to have created a plan with his father to murder Mary; that Zirko had slight gunshot residue on his hand; that Kelly's jeep had remnants of bleach in it on the day of the murders that was evidence of blood recovered from both the driver's side and the passenger side of Kelly's jeep; and that Zirko lied to the police about his whereabouts on the day of the murders. This evidence could certainly lead a jury to reasonably infer that Zirko aided, abetted, or solicited another person in planning or committing the murders of Mary and Margaret. We also note that the State clearly argued the theory of accountability in its closing argument.

¶ 37    Zirko also argues that the accountability instruction was improper because the identity of the principal is unknown. Again, we emphasize that only the *slightest evidence* is needed for the trial court to instruct the jury on the theory of accountability. *Beltran*, 327 Ill. App. 3d at 692-93, 765 N.E.2d at 1077-78. The State points out that it has been repeatedly held in Illinois that a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown. See *People v. Cooper*, 194 Ill. 2d 419, 435, 743 N.E.2d 32, 42 (2000); *People v. Cooks*, 253 Ill. App. 3d 184, 188-90, 625 N.E.2d 365, 386-70 (1993). We note that the evidence in *Cooper* and *Cooks* established that the defendants were present at the scene of the crime and participating with the unidentified principal in committing the crime.

¶ 38    Although there is no identifiable third party in this case, there is evidence that supports the theory of accountability. The fact that Zirko actively searched for a third party to harm

or murder Mary for nearly a year before she was killed, coupled with the fact that it is reasonable to infer that Mary or her family would never have voluntarily let Zirko enter her home, yet there was no sign of forced entry, constitutes slight evidence in support of the presence of a third party. Zirko would be accountable for the actions of that third party. The evidence shows that Mary had an order of protection against Zirko, that Mary and her family were aware of Zirko's murder-for-hire plot, and that Mary had her windows boarded up to protect against an attack from Zirko. Therefore, it is reasonable to infer that Zirko would have needed the assistance of a third party to gain access to Mary's house. Moreover, in addition to the evidence that Zirko went to great lengths to find a third party to commit the murder, there is circumstantial evidence (such as the bloody shoe print that did not match Zirko's shoes) to suggest that the killer was someone other than Zirko. While not overwhelming, we find that these facts, considered together, constitute slight, but sufficient, evidence to warrant the instruction on the theory of accountability. At trial, defense counsel argued that Zirko did not commit the murders. However, it is undisputed that these murders took place and thus someone was responsible. According to defense counsel's own theory, if Zirko did not commit the murders, then a third party must have been the culprit. Therefore, given Zirko's activity for a year prior to the crimes, a reasonable argument can be made that Zirko was accountable for that third party.

¶ 39    We do not, by our holding in this case, extend the theory of accountability. The specific facts of this particular case are consistent with the law that allows the trial court, in its discretion, to give an accountability instruction. Moreover, even if giving the accountability instruction was error, it would have been harmless because there was sufficient evidence to find Zirko guilty as the principal. See *Batchelor*, 202 Ill. App. 3d at 332, 559 N.E.2d at 959. Therefore, we hold that the trial court did not abuse its discretion in instructing the jury on the theory of accountability for the murders of Mary and Margaret.

¶ 40    Zirko next argues that the trial court erred in admitting his Internet browsing history into evidence at trial. We note that Zirko objected to the relevancy of the Internet browsing evidence during trial; however, he failed to raise this issue in his posttrial motion for a new trial. Generally, the failure to raise an issue in a posttrial motion results in forfeiture of that issue on appeal. *People v. Rodgers*, 288 Ill. App. 3d 167, 170, 680 N.E.2d 437, 440 (1997). However, Zirko asks this court to consider his argument using plain error analysis. The plain error doctrine allows a reviewing court to consider a forfeited issue in two circumstances: (1) where the evidence is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence; or (2) where the evidence is so serious that the defendant was denied a substantial right and thus a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005). The first step in deciding whether the plain error doctrine applies is determining whether any error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2007).

¶ 41    Evidence is considered to be relevant if it has the tendency to make any fact important to the determination of an action either more or less probable than it would be without the evidence. *People v. Morgan*, 197 Ill. 2d 404, 455-56, 758 N.E.2d 813, 843 (2001). Physical evidence can be admitted if there is proof to connect it with the defendant and the crime. *People v. Ursery*, 364 Ill. App. 3d 680, 686, 848 N.E.2d 146, 152 (2006). Proof of the

connection can be circumstantial, and evidence can be admitted if it is suitable for the commission of the offense, regardless of whether it was actually used in connection with the offense. *Id*. However, evidence may be inadmissible if it has little probative value due to remoteness, uncertainty, or its possibly unfair prejudicial nature. *Id*. The trial court has the discretion to determine whether evidence is relevant and admissible, and a trial court's decision will not be reversed absent a clear abuse of discretion. *Morgan*, 197 Ill. 2d at 455, 758 N.E.2d at 842.

¶ 42    We note that there have been few cases in Illinois that have dealt specifically with the admissibility of Internet browsing history at trial. In the case at bar, both parties have cited *People v. Pelo*, 404 Ill. App. 3d 839, 942 N.E.2d 463 (2010), as providing guidance on this issue. In *Pelo*, this court affirmed the defendant's convictions for aggravated criminal sexual assault and found that the admission of the defendant's Internet use was proper. The trial court in *Pelo* admitted Internet evidence including: 23 poster boards containing pornographic images, Internet search terms and gallery names; a slide show depicting Internet searches; and two 30-second movie trailers. *Id.* at 861, 942 N.E.2d at 483. The appellate court affirmed the trial court's finding that the vast majority of the Internet evidence was relevant because it tended to prove who committed the crimes since the evidence was found on the defendant's computer and it involved acts and scenarios that were emulated by the perpetrator. *Id*. at 864-65, 942 N.E.2d at 485-86. The appellate court also found that a small amount of the evidence, namely, pornographic images and galleries dealing with incest, caning, and a gynecological exam, were irrelevant to the State's theory of the case and should not have been admitted. *Id*. at 865, 942 N.E.2d at 486. However, the appellate court held that this error was harmless and the prejudicial effect of the Internet evidence did not substantially outweigh its probative value. *Id*. at 865-68, 942 N.E.2d 486-88. The appellate court held that the trial court did not abuse its discretion in admitting the Internet evidence. *Id*. at 868, 942 N.E.2d at 488.

¶ 43    In the case at bar, we hold that the Internet evidence admitted at trial was relevant to prove that Zirko committed the murders of Mary and Margaret or that Zirko solicited another person to murder Mary. The Web sites accessed and search terms that were used, the timing of this Internet activity, and Kelly's testimony that she was not responsible for any of the Internet activity leads to the conclusion that it was Zirko who used the Internet for those searches. That in turn suggests Zirko's motive and intent to commit the crimes. Zirko argues that some of the Internet evidence was too remote to be relevant and makes no connection to the crimes with which Zirko was charged. This includes the evidence of: searches for "GHB," "unconscious" and "liquid," "hire plus mercenary," "mercenary for hire," "private detective," "private detective Chicago," and the Glenview school district calendar; accessing www.anesthesia-nursing.com/ether, www.youspystore.com, www.homestore.com and www.private-investigator.com; searches for homes on www.realtor.com; MapQuest searches from Zirko's home to the Park Ridge house, and from Zirko's house to Mary's house; and the Internet activity regarding search terms and Web sites involving gun shows. The State argues that this evidence supports its theories that Zirko was considering various methods of killing Mary, that he would receive a windfall of insurance money in the event of Mary or Margaret's death, and that he was trying to find a time to kill Mary when the children

-12-

would not be at home. We find this to be persuasive. We are similarly unpersuaded by Zirko's argument that the Internet evidence is irrelevant because there may be other explanations as to why certain search terms were used and why certain Web sites were accessed. As the State points out, "[t]he contention that a different, reasonable inference might be drawn from the same evidence does not make the inference which the State chose to argue improper or impossible." *People v. McInnis*, 88 Ill. App. 3d 555, 575, 411 N.E.2d 26, 41 (1980).

¶ 44    In this case, we cannot say that the trial court's decision to admit the Internet evidence was arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it. Thus, we hold that the trial court did not abuse its discretion in admitting the evidence of Zirko's Internet browsing history. Because we hold that no error occurred at trial as to the admission of the Internet evidence, the plain error doctrine does not apply to this issue. Regardless, the Internet evidence was not a substantial factor in the jury finding Zirko guilty of murder and solicitation of murder. Absent the Internet evidence, there is still an overwhelming amount of circumstantial evidence, as well as some direct evidence, that establishes Zirko's guilt. Therefore, even if we were to find that the trial court erred in admitting the Internet evidence, we find that this case is not closely balanced and the error would not be so serious as to deny Zirko a fair trial. Thus, Zirko's argument would not satisfy either prong of the plain error doctrine.

¶ 45    We next consider Zirko's argument that the trial court erred in denying his motion to quash his arrest and suppress evidence. Specifically, Zirko argues that the trial court erred in not suppressing the statements Zirko gave to Sgts. Benbow and Stutzman on December 13, 2004 because he invoked his right to counsel and the police prevented his attorney from seeing him in violation of *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994). When reviewing a circuit court's decision as to a motion to suppress, a mixed question of law and fact is presented and the trial court's factual findings are upheld unless they are against the manifest weight of the evidence. *People v. Gherna*, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332, 882 N.E.2d 999, 1005 (2008). The reviewing court then reviews *de novo* whether the suppression was warranted under those facts. *Gherna*, 203 Ill. 2d at 175, 784 N.E.2d at 805.

¶ 46    Zirko first claims that he invoked his right to counsel when Sgts. Benbow and Stutzman came to his house on December 13, 2004, and again when he was placed in the interview room at the Glenview police department. A person subject to interrogation must be clearly informed that he has a right to counsel and that if he cannot afford one, an attorney will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 471-73 (1966). After a person has been given his *Miranda* rights, he may knowingly and intelligently waive those rights and an interrogation can continue. *Id.* at 475. However, if a person expresses his desire to obtain counsel, the interrogation must cease unless the accused himself initiates further communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In applying the *Edwards* rule, we must first determine whether the defendant invoked his right to counsel. *People v. Schuning*, 399 Ill. App. 3d 1073, 1082, 928 N.E.2d 128, 137 (2010).

This is an objective inquiry that requires, at a minimum, that the statement can reasonably be construed to be an expression of the desire for the assistance of counsel. *Id*. The interrogation does not have to cease if the defendant makes an ambiguous or equivocal reference to an attorney that a reasonable police officer would not have understood to mean that the defendant was invoking the right to counsel. *Id.*

¶ 47    In this case, Sgt. Stutzman testified that he and Sgt. Benbow approached Zirko's house at 6 p.m. on December 13, 2004. After entering the house, they asked Zirko if he would come to the station and speak with them. Sgt. Stutzman testified that Zirko said that he heard from relatives that Mary and Margaret were badly hurt, and that he had no problem going to talk with the officers. Sgt. Stutzman also testified that Zirko said that he had spoken to his lawyer and that his lawyer advised him not to say anything about Mary directly. Once they arrived at the station, the sergeants read Zirko his *Miranda* rights. Zirko refused to sign a Miranda waiver but agreed to talk to the sergeants further. During questioning, Zirko gave false alibi statements as to his whereabouts on December 13, 2004. After Zirko gave those statements, he said that his attorney advised him not to talk any further about his movements on that day and the sergeants honored Zirko's request. Zirko testified that when the officers were at his home he told them he spoke to his attorney and had nothing to say, that the sergeants handcuffed him and mirandized him, and that once they were at the station he asked the sergeants three times if he could go home and they refused. The trial court found Sgt. Stutzman's testimony to be more credible and accepted his version of the events.

¶ 48    There is nothing in the record to suggest that the trial court's findings of fact as to Zirko's interrogation were against the manifest weight of the evidence. The trial court found Sgt. Stutzman's and Commander Scott Stewart's (Commander Stewart) corroborating testimony to be more credible than Zirko's. Ruling on such a question is the responsibility of the trial court. We hold that the record does not support Zirko's assertion that he invoked his right to counsel.

¶ 49    Zirko also argues that the trial court erred in not suppressing his statements because the police refused to let his attorney see him in violation of *McCauley*. In *McCauley*, the supreme court held that there can be no knowing waiver of the right to counsel if the police refuse to inform a suspect that his attorney is present at the police station and waiting to see him. *McCauley*, 163 Ill. 2d at 425, 645 N.E.2d at 930. "[D]ue process is violated when police interfere with a suspect's right to his attorney's assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him." *Id*. at 444, 645 N.E.2d at 938.

¶ 50    At the hearing on the motion to suppress, the trial court was presented with conflicting testimony as to when Attorney Reardon arrived at the Glenview police station to meet with Zirko. Commander Stewart testified that there was a policy in place at the police station that he was to be immediately notified whenever an attorney comes to the station. Commander Stewart also personally instructed his staff to immediately notify him if anyone showed up on Zirko's behalf. Commander Stewart testified that while he was on the telephone, he heard a page over the loudspeaker at 7:25 p.m. He did not respond to the page because he was speaking with one of Mary and Margaret's relatives. A few minutes later, an officer approached Commander Stewart and told him that Zirko's attorney had arrived at the police

station. Commander Stewart ended his phone call at 7:30 p.m. Commander Stewart then went to the interview room where Sgts. Benbow and Stuztman were interviewing Zirko and told them to stop their questioning. While walking toward the lobby, Commander Stewart heard a second page and stopped to call the front desk and respond. During the call to the front desk, Commander Stewart was again told that Zirko's attorney had arrived. Commander Stewart continued to the lobby, exchanged business cards with Attorney Reardon, and brought him to the interview room. Commander Stewart testified that he first met Attorney Reardon between 7:30 and 7:35 p.m. Attorney Reardon never complained about a lengthy wait time.

¶ 51    Attorney Reardon testified that he received a call from Zirko's mother at 6 p.m. telling him that Zirko was being taken to the Glenview police station. Attorney Reardon then left his office at 221 N. Lasalle Street, Chicago, Illinois, and proceeded to the Glenview police station. Attorney Reardon testified that he arrived at the Glenview police station at 6:50 p.m. He testified that he knew it was 6:50 p.m. because he wrote down the time in his notes. Attorney Reardon testified that once he arrived at the police station, he gave an officer at the intake window his business card immediately. He said that he waited until 7:20 p.m. and then went to the window again, spoke with a different officer, gave that officer another business card, and asked to speak with Zirko. Attorney Reardon was not able to recall the names or genders of the officers with whom he spoke. Attorney Reardon testified that 15 minutes later around 7:35 p.m., Commander Stewart came out to greet him. He stated that it took a total of 45 minutes for him to speak with Zirko after he arrived at the police station.

¶ 52    The trial court found that the policy of immediately notifying Commander Stewart as soon as an attorney arrives at the police station was scrupulously followed. The trial court noted that it was not surprising that it took the sergeants and Zirko almost 40 minutes to get from Zirko's house to the police station because it was December in Chicago in the middle of the holiday season. The trial court found that there was no attempt to rush through questioning Zirko at the police station, and no attempt to stall Attorney Reardon from seeing Zirko. Specifically, the trial court found that as soon as Commander Stewart heard that an attorney was present, he stopped the questioning. Although the trial court found Attorney Reardon to be a credible witness, it questioned whether it was possible to travel from downtown Chicago to the Glenview police station and arrive just 10 minutes after the sergeants and Zirko arrived. The trial court denied Zirko's motion to suppress.

¶ 53    Zirko argues that the trial court based its ruling on its personal opinion as to how long it would take to drive from downtown Chicago to the Glenview police station. We disagree. The trial court, after weighing the conflicting testimony, found Commander Stewart's recitation of the events on December 13, 2004 to be more credible. Based on the testimony presented, the trial court concluded that it would take significantly longer to travel from downtown Chicago to the Glenview police station than it would take to travel from Zirko's house to the Glenview police station. We are unable to say that the trial court's factual findings were against the manifest weight of the evidence. Although Attorney Reardon and Commander Stewart presented conflicting testimony, the opposite conclusion as to the trial court's findings is not clearly evident. Applying the trial court's factual findings to the rule established in *McCauley*, we cannot say that Commander Stewart and the Glenview police

department denied Attorney Reardon access to Zirko on December 13, 2004. Therefore, we hold that the trial court properly denied Zirko's motion to quash his arrest and suppress evidence.

¶ 54    Zirko next argues that the State failed to prove beyond a reasonable doubt that he committed the murders of Mary and Margaret and that he committed solicitation of murder. Because the analysis for the murder offenses and the solicitation offense is the same, we will discuss them together. The parties disagree as to the standard of review to be applied to this issue. It is well settled that when the reviewing court considers a challenge to the sufficiency of the evidence, it determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the State. *People v. Cervantes*, 408 Ill. App. 3d 906, 908, 945 N.E.2d 1193, 1195 (2011). "[D]eterminations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact." *People v. Jimerson*, 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903 (1989). We note that even if we were to apply the *de novo* standard as Zirko urges, we would still reach the same conclusion.

¶ 55    "A person who kills an individual without lawful justification commits first-degree murder if, in performing the acts which cause the death: (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a) (West 2004). Zirko points out that despite the gruesome nature of the murders and a full-scale investigation by NORTAF, no physical evidence, DNA, saliva, fingerprints, shoe prints, fibers, or blood of the assailant was found at the scene of the crime. He argues that the State's case was therefore premised solely on circumstantial evidence, which was weak and insufficient to prove Zirko's guilt beyond a reasonable doubt. He also presents a number of alternative explanations for the evidence presented at trial in an attempt to show that the evidence is insufficient to prove that Zirko committed the murders. However, it is well settled in Illinois that a conviction can be sustained solely on circumstantial evidence. As the State points out, " '[a] conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it.' " *People v. Patterson*, 217 Ill. 2d 407, 435, 841 N.E.2d 889, 905 (2005) (quoting *People v. Williams*, 40 Ill. 2d 522, 526, 240 N.E.2d 645, 648 (1968)). Without engaging in a lengthy recitation of the facts, we find that testimonies at trial along with the physical evidence of the GSR found on Zirko's hand were more than sufficient to support the jury's finding of a guilty verdict. Based on the evidence, it is entirely possible that a trier of fact could have found Zirko guilty of murder beyond a reasonable doubt.

¶ 56    We reach the same conclusion as to Zirko's conviction for solicitation of murder. A person commits solicitation of murder when, with the intent that the offense of first-degree murder be committed, he commands, encourages or requests another to commit that offense. 720 ILCS 5/8-1.1(a) (West 2004). It is immaterial that Zirko did not request that Dr. Larson

be the actual person to commit the murder. A defendant's comments asking another to find someone to commit the murder is sufficient to support a conviction of solicitation. See *Quiroz*, 253 Ill. App. 3d at 745, 625 N.E.2d at 861; *People v. Pagliuca*, 119 Ill. App. 3d 906, 910, 458 N.E.2d 908, 912 (1983). At trial, Dr. Larson testified that Zirko asked him many times to find someone to kill Mary. Zirko even specified that he could pay the killer from the proceeds of Mary's life insurance policy of which he was the beneficiary. This testimony is likewise sufficient to support a jury's finding that Zirko was guilty of solicitation. Therefore, we are unpersuaded by Zirko's arguments. We hold that the State proved beyond a reasonable doubt that Zirko was guilty of murder and solicitation of murder.

¶ 57    We next examine Zirko's argument that his trial counsel was ineffective for requesting that the murder and solicitation of murder charges be joined. In order to require reversal, a defendant's claim that counsel's assistance was ineffective requires the defendant to show that the counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order for the counsel's performance to be deficient, it must fall below an objective standard of reasonableness. *Id*. at 687-88. In order for a defendant to be prejudiced by the counsel's performance, the defendant must show that the counsel's errors were so serious that they deprived the defendant of a fair trial. *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶ 58    A claim for ineffective assistance of counsel which "arises from a matter of defense strategy will not support a finding of ineffective [assistance of counsel]." *People v. Smith*, 177 Ill. 2d 53, 93, 685 N.E.2d 880, 897 (1997). Showing that a trial strategy was unsuccessful is not enough to overcome the presumption that the strategy was sound. *People v. Rosemond*, 339 Ill. App. 3d 51, 65, 790 N.E.2d 416, 428 (2003). In this case, Zirko argues that there is no conceivable trial strategy for requesting that the murder and solicitation of murder charges be joined because they were not subject to compulsory joinder (720 ILCS 5/3-3(b) (West 2004)) and would not have been joined under permissive joinder (725 ILCS 5/111-4(a) (West 2004)) had the State sought to join them instead of the defense. In response, the State argues that the charges would have been joined under permissive joinder. The State also argues that even if the charges are not part of the same transaction and do not meet the requirements of the permissive joinder statute, the defendant can still be tried under the disassociated charges if he agrees to the joinder. *People v. Marts*, 266 Ill. App. 3d 531, 542, 639 N.E.2d 1360, 1368 (1994); *People v. Benka*, 117 Ill. App. 3d 221, 223, 453 N.E.2d 71, 72 (1983). More than merely agreeing to joinder of the murder and solicitation of murder charges, defense counsel requested that they be joined. Thus, it is immaterial whether the trial court would have allowed the charges to be joined had the State so moved.

¶ 59    We consider the decision to join the murder and solicitation of murder charges to be a matter of trial strategy. The record establishes that defense counsel considered the effect of this strategy and discussed the strategy with Zirko prior to trial. When defense counsel asked that the charges be joined, the State noted, that as a result, some evidence that would be presented exclusively in either a trial for murder or a trial for solicitation of murder may be admitted for consideration on both charges. Consequently, the trial court addressed Zirko

directly and Zirko confirmed that he agreed to the joinder of the charges. Although the strategy was ultimately unsuccessful, we cannot say that defense counsel's decision fell below an objective standard of reasonableness. The success of the strategy is not the retrospective barometer of its propriety. We note that Zirko relies on *People v. Karraker*, 261 Ill. App. 3d 942, 633 N.E.2d 1250 (1994), and *People v. Lewis*, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992), in an attempt to show that there was no conceivable tactical advantage to defense counsel's decision. However, both *Karraker* and *Lewis* involve a defense counsel's failure to sever charges that were joined, not a defense counsel's request to join charges. Thus, these cases are factually distinguishable and inapplicable to the case at bar.

¶ 60    Additionally, we hold that Zirko was not prejudiced by the joinder of the murder and solicitation of murder charges. The potential prejudice of a jury deciding two separate charges is greatly diminished where the jury is going to receive evidence about both charges anyway. *People v. Trail*, 197 Ill. App. 3d 742, 746, 555 N.E.2d 68, 71 (1990). Although Zirko concedes that the evidence of the solicitation of murder would be admissible in a separate murder trial, he argues that the evidence of Mary's and Margaret's murders would not be admissible at a separate trial for solicitation of murder. However, as the State points out, subsequent acts or crimes are admissible to show *modus operandi*, motive, intent, plan or scheme of conduct. *People v. Miszkiewicz*, 236 Ill. App. 3d 411, 424, 602 N.E.2d 1312, 1321 (1992). Thus, we cannot definitively say that the evidence of Mary's and Margaret's murders would not have been admissible at a separate trial for solicitation of murder. We hold that Zirko has failed to show that there is a reasonable probability that but for defense counsel's conduct, the results of the proceeding would have been different. Therefore, we hold that defense counsel's conduct was not ineffective.

¶ 61    Zirko next argues the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), and that such failure requires that Zirko's convictions be reversed and the matter be remanded for new trial. We note that Zirko did not raise this objection at trial and did not include this issue in his post trial motion for new trial, therefore, he forfeits consideration of this issue on appeal. *Rodgers*, 288 Ill. App. 3d at 170, 680 N.E.2d at 440. However, Zirko asks that we review this issue under the plain error doctrine. As previously discussed, the first step in our review is to determine whether any error occurred in the first place.

¶ 62    Rule 431(b) states that "[t]he court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007); See also *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). The rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of the four principles, and the questioning can be done individually or in a group. *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409-10 (2010). However, Rule 431(b) does not dictate a precise

methodology for establishing a potential juror's understanding or acceptance of the principles, and the precise language of Rule 431(b) need not be used. *People v. Digby*, 405 Ill. App. 3d 544, 548, 939 N.E.2d 581, 585 (2010). Interpretation of a supreme court rule is reviewed *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 41-42, 862 N.E.2d 977, 979 (2007).

¶ 63     In *Digby*, the trial court addressed the four principles in Rule 431(b) and asked the jurors if they " 'had a problem' " with certain principles or " 'disagreed' " with them. *Digby*, 405 Ill. App. 3d at 548, 939 N.E.2d at 584. This court held that although the trial court did not use the precise terms " 'accept' " and " 'understand,' " the court still complied with Rule 431(b) because the words the trial court used "were appropriate and clearly indicated to the prospective jurors that the court was asking them whether they understood and accepted the principles enumerated in the rule." *Id*., 939 N.E.2d at 585. In making its ruling, this court noted that it has previously found that the trial court complied with Rule 431(b) when it has admonished potential jurors [as a group] and then asked whether they had "difficulty or quarrel" with each of the four principles. (Internal quotation marks omitted.) *Id*. The court even noted that it would be sufficient to ask for the jurors' response through a show of hands. *Id*. at 549, 939 N.E.2d at 585.

¶ 64     In this case, the trial court addressed the venire at length regarding their responsibilities as jurors and the four principles of Rule 431(b). Notably, the trial court stated that "it is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles." The trial court also stated "it will be the duty of the jury to accept the law that is contained in my instructions whether you agree with it or not." The trial then asked each prospective juror individually if he or she understood the first, second, and fourth principles. It is clear that the trial court addressed all four principles to the prospective jurors as a group. During that time, the trial court noted the importance of understanding the principles and the jurors' duty to accept the principles. The trial court then instructed the prospective jurors individually on the first, second, and fourth principles. Although the trial court did not used the terms "understand" and "accept" in rapid succession, the court addressed both these terms when speaking to the prospective jurors as a group. We note that this instruction is more effective than using language such as "have a problem," "disagree," or "difficulty or quarrel." Therefore, we hold that the trial court complied with Rule 431(b). Because we find that no error occurred, we find that the plain error doctrine does not apply to this argument.

¶ 65     We note that, even if we were to find that the trial court did not comply with Rule 431(b), this error still would not be grounds for reversal. In *Thompson*, the court held that in order for noncompliance with Rule 431(b) to warrant automatic reversal of a conviction, it must equate to structural error. *Thompson*, 238 Ill. 2d at 608, 939 N.E.2d at 410. The court ruled that absent any showing that the jury was biased as a result of the Rule 431(b) error, the defendant was not able to establish structural error. *Id*. at 610-11, 939 N.E.2d at 412. In this case, Zirko presents no evidence to show that the jury was biased in any way. Therefore, even if we were to find that the trial court failed to comply with Rule 431(b), the error would not amount to a structural error. Moreover, we do not consider this case to be closely balanced and such an error would not be so serious as to deny Zirko a fair trial. Thus, we find that Zirko would fail to satisfy either prong of the plain error doctrine. Accordingly, we reject his

argument that the trial court did not comply with Rule 431(b).

¶ 66    Finally, Zirko argues that this matter should be remanded because the trial court failed to address his *pro se* claim for ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984) (requiring that the trial court conduct an inquiry into the basis of a defendant's *pro se* posttrial claims of ineffective assistance of counsel). Following the convictions but before sentencing, Zirko sent to the court a *pro se* motion for new trial based on ineffective assistance of counsel alleging that defense counsel failed to subpoena 30 witnesses that he and defense counsel had agreed should be subpoenaed. He also claimed that defense counsel coerced him into waiving his right to testify by repeatedly advising him over a period of four years not to testify. The *pro se* motion was stamped "Received" by the clerk of the court; however, it was not file stamped. The record indicates that the trial court never ruled on Zirko's *pro se* motion.

¶ 67    Zirko argues that it is well settled that a trial court must conduct some inquiry into the basis of a defendant's *pro se* motion which alleges ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631 (2003); *Krankel*, 102 Ill. 2d at 189, 464 N.E.2d at 1049. Sufficient inquiries include some exchange between the trial court and counsel regarding the facts and circumstances of the defendant's claim; a brief discussion between the trial court and defendant; or the trial court's evaluation of its knowledge of defense counsel's performance at trial coupled with the insufficiency of the defendant's allegations on their face. *Moore*, 207 Ill. 2d at 78-79, 797 N.E.2d at 638. If the trial court fails to conduct an inquiry, on a *bona fide* petition, the matter must be remanded for the limited purpose of allowing the trial court to conduct the required preliminary investigation. *Id*. at 81, 797 N.E.2d at 639-40.

¶ 68    However, "[t]he decisions of what witnesses to call and what evidence to present are generally unassailable matters of trial strategy that cannot form the basis of a claim of ineffective assistance of counsel." *People v. Ward*, 371 Ill. App. 3d 382, 433, 862 N.E.2d 1102, 1149 (2007). "Where a defendant's *pro se* posttrial ineffective assistance claims address only matters of trial strategy, the court may dismiss those claims without further inquiry." *Id*. The claims in Zirko's motion exclusively addressed trial strategy. Specifically, witnesses that defense counsel allegedly failed to subpoena and defense counsel's alleged advice to Zirko that he should not testify. As discussed, these claims do not form the basis of a claim for ineffective assistance of counsel. In this case, there was a lengthy opportunity for the trial court to observe defense counsel and to be immersed in the case given the facts and the manner in which it was defended. Under the particular facts of this case, we will not penalize the trial court for failing to rule on Zirko's *pro se* motion alleging ineffective assistance of counsel.

¶ 69    Further, it is particularly noteworthy that there is no evidence in the record to suggest that the trial court was ever aware of Zirko's *pro se* motion. In fact, the record suggests that only Zirko knew that he had filed such a motion. Yet, he never informed the court during a lengthy hearing which presented an opportunity to be heard.

¶ 70    Notwithstanding that the claims in Zirko's *pro se* motion do not form the basis of a claim for ineffective assistance of counsel, Zirko's argument also fails because he did not bring his

motion to the attention of the trial court. In order to trigger the trial court's duty to conduct a *Krankel* inquiry, it is the duty of the defendant to bring the *pro se* posttrial claim of ineffective assistance of counsel to the attention of the trial court. *People v. Patrick*, 2011 IL 111666, ¶ 29, 960 N.E.2d 1114. "[A] defendant who fails to bring such a claim to the trial court's attention forfeits [the claim] *notwithstanding having presented it in a letter to the court*." (Emphasis added.) *People v. Allen*, 409 Ill. App. 3d 1058, 1076-77, 950 N.E.2d 1164, 1182 (2011).

¶ 71     In *Allen*, after a bench trial, the defendant filed a letter with the court claiming ineffective assistance of counsel. *Id*. at 1066, 950 N.E.2d at 1174. The defendant did not raise his claims of ineffective assistance of counsel during his sentencing hearing or during the hearing on his motion to reconsider. *Id*. at 1077, 950 N.E.2d at 1182. The trial court did not address the defendant's claims of ineffective assistance of counsel. *Id*. at 1066, 950 N.E.2d at 1174. The Illinois Appellate Court for the Fourth District held that because the defendant did not raise his claims of ineffective assistance of counsel during his posttrial appearances, he did not bring the claims to the attention of the court and therefore forfeited his claims. *Id*. at 1077, 950 N.E.2d at 82 (quoting *People v. Lewis*, 165 Ill. App. 3d 97, 109, 518 N.E.2d 741 (1988) (which held: "It would also appear *** that the trial judge, defendant's counsel, and the State were all unaware of defendant's letter as no mention was made of it, and defendant did not himself refer to it ***. [Citation.] Thus, defendant did not pursue the matter contained in his letter and *** waived any issue in this regard on appeal.")).

¶ 72     In the instant case, much like in *Allen* and *Lewis*, Zirko sent his *pro se* motion which alleged ineffective assistance of counsel to the trial court. The clerk of the court stamped the motion "Received," but it was not file stamped. During Zirko's lengthy sentencing hearing, he was given an opportunity to make a statement to the court. Zirko made a brief statement but did not make any mention of the *pro se* motion which he had sent to the court. Likewise, the court, Zirko's defense counsel, and the State made no mention of Zirko's *pro se* motion or the specific allegations contained therein. In fact, the record strongly suggests that neither the trial judge, defense counsel, nor the State knew of the *pro se* motion or its contents. Similar to *Allen* and *Lewis*, the record suggests that the court and the attorneys were completely unaware of Zirko's *pro se* motion. We note that Zirko does not argue that he brought the *pro se* motion to the attention of the court. Because Zirko failed to bring his *pro se* motion to the attention of the trial court, Zirko has forfeited his claims of ineffective assistance of counsel. We cannot require the trial court to rule on a motion of which the court had no knowledge.

¶ 73     We acknowledge that an earlier opinion of the Illinois Appellate Court for the Fourth District held that a defendant *did not* forfeit his *pro se* claims of ineffective assistance of counsel when he failed to mention them during his sentencing hearing while making a statement to the court. *People v. Peacock*, 359 Ill. App. 3d 326, 340, 833 N.E.2d 396, 408 (2005). The *Peacock* court did not mention *Lewis* in its holding. We decline to follow the holding in *Peacock* and find the reasoning in *Allen* and *Lewis* persuasive.

¶ 74     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 75          Affirmed.